[No. 22717. Department Two. May 12, 1931.]

NELSON TROYER, *Respondent,* v. JOHN FOX *et al.,* *Appellants.*[1]

[1]Reported in 298 Pac. 733.

*McMicken, Ramsey, Rupp & Schweppe* and *Peters, Powell, Evans & McLaren,* for appellants.

*Riddell, Brackett & Fowler,* for respondent.

MILLARD, J.—Plaintiff seeks by this action to recover from defendants twenty-five thousand dollars as the value of his half interest in certain patents transferred by him to the Continental Can Company. Plaintiff alleges that he was the owner of an undivided one-half interest in certain patents on machinery which he had designed, but which were being used by the Seattle-Astoria Iron Works; that the remaining one-half interest in the patents was owned by the iron works; that in October, 1927, he and the other stockholders of the iron works, desiring to sell their interest in the iron works to the Continental Can Company, entered into negotiations with the latter for an exchange of the iron works stock for the can company's stock.

An option contract was prepared to be signed by each stockholder of the iron works, whereby the can company was given a written option on all of said stock on an exchange basis of three and one-quarter shares of can company stock for each share of iron works stock. The option and the certificates of stock were placed in escrow with a certain bank, and there was also placed in escrow, as a part of the transaction, an assignment by all the stockholders, including plaintiff Troyer, of any interest they might have in any of the patent rights in question.

It is further alleged that, before the execution of the option contract, defendants John Fox and F. C. Fox orally promised and agreed that, if the plaintiff would

join with the other stockholders in the execution of a contract including the assignment of patent rights, they, the defendants, would pay him on account of his interest in the patents twenty-five thousand dollars in cash or in stock of the can company of that value, and that, in reliance upon that promise and agreement, the plaintiff executed the option and assignment of patent rights in question.

Plaintiff amended his complaint before the trial, and charged the defendants with the promise to pay him for his patent interests "the reasonable value thereof, to-wit, the sum of twenty-five thousand dollars." The complaint was further amended to allege that the plaintiff had executed the papers in question "at the special instance and request of the defendants."

Denying the value of the plaintiff's interest in the patents exceeded five thousand dollars, and denying any agreement on their part to pay the plaintiff anything for his interest in the patents, defendants admitted the execution of the option papers and assignments of patents. They also admitted that plaintiff owned an undivided one-half interest in the patents, but allege that his title thereto was limited by the terms of a resolution passed by the directors of the iron works on February 27, 1920.

Finding for the plaintiff in the full amount of twenty-five thousand dollars, the court refused to make any finding of an express contract, expressing the view that the defendants did not agree to give the plaintiff any particular sum,—

" . . . made no agreement at all, and he did not agree to waive his claim,—he made no agreement at all. It was all understood that all were getting the benefit of the interest which he was selling, and which all recognize was his interest."

540

The findings pertinent to this appeal, and which, defendants insist, negative the existence of any implied contract, read as follows:

"On or about the 28th day of October, 1927, the plaintiff and other stockholders of the Seattle Iron Works, being desirous of selling their interest in the said corporation entered into negotiations with the Continental Can Co., a corporation organized and existing under the laws of the State of New York, with a view to exchanging all of the shares of the corporate stock of Seattle Astoria Iron Works, a Washington corporation, to the said Continental Can Co. for certain shares of stock in the said Continental Can Co. In the course of said negotiations a certain option contract was prepared whereby it was agreed between the Continental Can Co., as optionee, and purchaser on the one hand, and the said stockholders of the Seattle Astoria Iron Works as such stockholders, and Nelson Troyer as the owner of said undivided one-half interest in the said patents, all as optionors, that the said optionors would sell to the said optionee under the said option contract and said optionee would buy from the said optionors all of the capital stock, *consisting of five thousand shares,* of the Seattle Astoria Iron Works, *and the undivided one-half interest of the said Nelson Troyer in the said patents* in exchange for the delivery to the said optionors of 16,250 shares of the capital stock of the said Continental Can Co. It was also agreed in the said option agreement that the said stockholders and optionors should retain as their individual property 666 shares of the capital stock of Continental Can Co., which was then a part of the assets of the Seattle Astoria Iron Works. *Before the execution of the said option contract by the plaintiff, the plaintiff orally informed the defendants,* John Fox and F. C. Fox, *that if he joined with the other stockholders* of the Seattle Astoria Iron Works *in the execution of said option contract and likewise assigned his interest in the said patent rights to the said Continental Can Co. that he would expect the said John Fox and F. C. Fox to pay to him* on account of his half interest in *said patents a portion of the reason-*

*able value thereof,* to-wit, the sum of $25,000.00, either in cash or by assigning and delivering to the plaintiff stock in the Continental Can Co. to the then market value of $25,000.00, which said stock in the Continental Can Co. was then and during all of the time since has been of the fair and reasonable market value of $75.00 per share, or in excess of that value. *After the plaintiff so notified the defendants* as above set forth on or about the 26th day of October, 1927, *there was no further communication between the parties until after the execution of said option agreement* on the 28th day of October, 1927.''

''The plaintiff believed that the said John Fox and F. C. Fox would pay him the said $25,000.00, or would assign and deliver to him stock in the Continental Can Co. of the market value $25,000.00, and the said defendants knew that the plaintiff believed they would do so and with the knowledge that the plaintiff so believed and well knowing he expected them to pay him the said $25,000.00, or assign and deliver to him stock in the Continental Can Co. of the market value of $25,-000.00, the plaintiff and the defendants executed and authorized the delivery of the said option contract and the assignment of the said patents by the Seattle Astoria Iron Works and the plaintiff assigned to the Continental Can Co. his undivided one-half interest in the said patents, more particularly set forth and described in paragraph III of plaintiff's complaint.'' (Italics ours.)

Judgment was entered in favor of the plaintiff. The defendants appealed.

In May, 1906, the respondent, who was then the manager of the Portland, Oregon, branch of the American Can Company, became, through purchase of stock therein of A. K. Fox, brother of John Fox, the vice-president and manager of the Astoria Iron Works of Astoria, Oregon. Appellant John Fox owned the majority of the stock of that company. In 1913 the corporation which, from 1917 to 1927, existed as the Seattle-Astoria Iron Works, moved its plant to Seattle.

Of its 5,000 shares of capital stock in 1927, the respondent owned 1,300 shares and the appellants owned 2,654 shares. John Fox was president and Nelson Troyer was manager of the company, which was engaged in the business of manufacturing can-making machinery. The company prospered from the entry of Troyer therein. Its prosperity was due in a very large measure to the inventive genius of the plaintiff. Troyer was very generously treated by appellant John Fox, who made it possible, by liberal terms of credit, for the respondent to acquire stock of the corporation.

The capital stock of the company in 1906 was of the value of $20,000, 400 shares at $50 each. In 1913, by a stock dividend, the capital stock was increased to $200,000, divided into 2,000 shares of $100 each. By another stock dividend in 1920, the capital stock was increased to $500,000, divided into 5,000 shares of $100 each. This was the capital stock of the corporation until October, 1927, when it was consolidated with the Continental Can Company.

At the request of respondent Troyer that the corporation confirm in him a half interest in all patents on inventions which he might subsequently create, a resolution to that effect was introduced November 9, 1918, at a meeting of the directors of the Seattle-Astoria Iron Works. Due to the opposition of some of the stockholders, the passage of the resolution, which reads as follows, was delayed until February 27, 1920, when it was unanimously adopted:

"Of any patents taken out in the future by any stockholder of this corporation, the patentee, is to retain an undivided one-half interest in such patent. So long as the patentee remains in the company all earnings from the patent are to go into the company. In the event of the patentee severing his connections with

the company, the company is to have the first refusal of the purchase of his one-half interest in any patent he may own.''

In January, 1927, the Continental Can Company interested itself in the acquisition of the shares of stock of the Seattle-Astoria Iron Works. In September, 1927, the respondent went to New York, taking with him a financial statement of the iron works and a list of the patents, which list disclosed that the respondent owned an undivided one-half interest in certain of the patents. As a result of his negotiations with the can company's officials, the plaintiff brought back to Seattle a proposed form of option contract for the stockholders of the iron works to sign, which option included the patents. The option agreement was executed by the stockholders of the iron works in October, 1927, and the iron works later taken over by the can company. Respondent was retained as vice-president of the Seattle-Astoria Iron Works, the name of which was changed to the Troyer-Fox Manufacturing Company. Respondent was the only one of the old organization that was retained by the can company. He performs the same duties at the plant as formerly and receives the same salary, eighteen thousand dollars annually.

When respondent, in September, 1927, was negotiating in New York with the can company, he knew that the can company would insist upon the inclusion of the patent rights in the conveyance. The original offer, prepared in New York and mailed back to Seattle, included those patent rights. Mr. Troyer testified:

''It was a natural supposition in my mind that they would require everything pertaining to the iron works business, and particularly the patents on the machinery.''

He further testified that the can company would require one hundred per cent of all of the patents:

"Not definitely, no, although there was some mention made that some arrangement of that kind would have to be made—that they would require one hundred per cent of all the patents."

The idea of demanding extra compensation was doubtless an afterthought of the respondent. He did not raise it until at the conclusion of the entire negotiations. Counsel for the iron works testified that the original option, the one that respondent testified he either brought out from New York or mailed out from New York, contained an assignment of the patent equities, and that respondent Troyer told him that the Continental Can Company insisted in New York that the entire patents be included.

"Q. Isn't it a fact, Mr. Kane, that the first time that Mr. Troyer knew that the Continental Can people expected Mr. Troyer to turn over his interest in the patents as a part of this transaction was just within a day or two of the meeting in your office?

"A. Oh, no, no; no, no, no. And if you will go back and get the original option, you will find—why he said —he told both ourselves, I knew he told me that they insisted in New York that the entire patents be put in —that is, after he started raising the discussion with me. But if you will go back and get your documents, I think you will find that they provide in their original document in New York that this had to go in."

The assignment of respondent's half interest did not add anything to the consideration paid by the can company for the iron works stock. That clearly appears from testimony of respondent on cross-examination:

"Q. Well, when they finally concluded that they would require you to assign your half interest in these patent rights to the Seattle-Astoria Iron Works, did that increase their offer—did they increase their offer?

"A. No, except they finally agreed to allow us to retain the 666 shares of Continental Can Company stock.

"Q. In other words, your assigning your half interest in these patent rights of the Seattle-Astoria Iron Works did not increase the price one penny that the stockholders of the Seattle Astoria Iron Works were to receive, did it?

"A. Their offer was made, of course, that they would have all of the assets of the company. Not all of the assets of the company would be included in what they got."

The resolution confirming in the respondent a one-half interest in all patents on subsequent inventions by him, did not obligate the Seattle-Astoria Iron Works or any one of its stockholders to buy the respondent's half interest. The company was given an option to purchase such one-half interest if the respondent left the company. ". . . the company is to have the first refusal of the purchase of his one-half interest in any patent he may own." It is inconceivable that a company having such an option, and then being absorbed through the purchase of all of its stock by another company (the respondent being retained by the new company as manager of the absorbed company), that such company, or any of its stockholders, is thereby obligated to purchase the respondent's one-half interest. To state the facts is to declare the law applicable thereto.

There is an utter failure of proof that appellants, prior to the signing of the option by the stockholders of the iron works, orally promised or agreed to pay to respondent anything to induce him to sign the option and assign his patent interests to the can company. Nor can we agree that the findings of the trial court are sufficient to sustain the judgment. There was neither an express or implied agreement

by the appellants to pay to the respondent any sum if he would assign his patent rights. In fact, they rejected the respondent's proposition.

Though respondent, prior to the execution of the said option contract by him, orally informed the appellants that, if he joined with the other stockholders of the iron works in the execution of the option contract, and likewise assigned his interest in the patent rights to the Continental Can Company, he *would expect* the appellants to pay him on account of his interest in the patents the sum of twenty-five thousand dollars, such belief or expectation does not of itself constitute a contract. Appellants did not accept that offer. If that offer received no response, appellants' silence cannot be construed as an acceptance. Mere silence when an offer is made does not constitute an acceptance of the offer. The failure to reject an offer is not equivalent to assent. Page on Contracts, § 160; *Carnahan Mfg. Co. v. Beebe-Bowles Co.,* 80 Ore. 124, 156 Pac. 584.

"The further contention is that notice to the respondent that the owners accepted the offer was not necessary in order to bind him. But the general rule is to the contrary. It was so recognized by us in *Ranahan v. Gibbons,* 23 Wash. 255, 62 Pac. 773, where we quoted from Parsons on Contracts to the following effect:

" 'It is unquestionably true as a general proposition, that a contract cannot bind the party proposing it, and indeed there is no contract, until the acceptance of the offer by the party receiving it is in some way, actually or constructively, communicated to the party making the offer.'

"In 6 R. C. L., 606, this language is used:

" 'In the case of an offer which requires a reciprocal promise it is clear that mental determination to accept, or even an act done in pursuance thereof, is insufficient to bind the party who makes the offer. To constitute acceptance of such an offer there must be an expression

of the intention, by word, sign, or writing communicated or delivered to the person making the offer, or his agent. A mere private act of the person to whom the offer is made does not constitute acceptance. For instance, a mere proposal to sell land does not become a sale until accepted, and notice of acceptance given the proposer. A reciprocal promise is required, the party to whom the offer is made must, if he cannot directly communicate his acceptance, use such an agency therefor as amounts to constructive knowledge to the other party. It is nevertheless essential, to convert such proposal into a valid contract, that such acceptance be communicated to the proposer, . . .'

"So, in 13 C. J. 284, it is said:

" 'Since communication of intention is essential to an agreement, an acceptance, like an offer, must, as a rule, be communicated to the offerer or put in the course of communication by an act. There is a radical distinction in regard to communications between offers which ask that the offeree shall do something and offers which ask that the offeree shall promise something. In offers of the former kind communication of the acceptance is ordinarily not required; in offers of the latter kind communication of the acceptance is always essential.'

"It will be observed that the texts cited note a distinction between offers which ask that the offeree shall do something and offers which ask that the offeree shall promise something, stating the rule to be that communication of the acceptance is not required in the one instance, while in the other it is always essential. An examination of the decisions on the question show that the courts generally make the distinction noted, although there may be some difficulty in reconciling their conclusions when considered with reference to the facts before them." *Koepke Sayles & Co. v. Lustig,* 155 Wash. 70, 283 Pac. 458.

"One to whom an offer is made must either accept it or reject it. And if he does not accept it he necessarily rejects it. . . . The defendant's silence is not to be regarded as any assent upon its part. Silence is not assent unless there is a duty to speak, and there

was no such duty in this case. In Williston on Contracts, vol. 1, § 91, the rule is correctly laid down as follows:

" 'Generally speaking, an offeree has a right to make no reply to offers, and his silence and inaction cannot be construed as an assent to the offer.'

"That writer goes on to say that, 'even where there is no duty to speak, a line of argument which has not been formally stated in the cases may be advanced to indicate that mere silence, though unaccompanied by any act, may amount to an acceptance if the offeree requested that mode of indicating assent, and assent was intended by the offeree. When an offer is made to one who remains silent, the silence may be due to a variety of causes. It is clear that, whatever may have been the offeree's state of mind, no contract can be made unless the offer stated that the offerer would assume assent in case the offeree made no reply. But if the offer does so state, the offeree's silence is ambiguous, and may doubtless be shown not to have meant assent. Certainly the offeree has the right to keep silent if he chooses without thereby becoming charged with a contract. But it is at least possible that he did mean assent, if in fact this was his meaning, there is good reason for urging that a contract has been formed.' We do not find in this case evidence showing that the defendant by its silence meant assent. And the courts hold that, even though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance. *In re Empire Assurance Corporation*, L. R. 6 Ch., 266; *Prescott v. Jones*, 69 N. H. 305, 41 A. 352. In *Bank of Buchanan County v. Continental National Bank of Los Angeles* (C. C. A.), 277 Fed. 385, 390, it is said that 'one to whom an offer is made is under no obligation to do or say anything concerning an offer which he does not accept.' And in 13 Corpus Juris, 276, it is stated that 'an offer made to another orally or in writing, cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that

silence will be taken as consent, for the offerer cannot prescribe conditions of rejection so as to turn silence on the part of the offeree into acceptance.' '' *Columbia Malting Co. v. Clausen-Flanagan Corporation,* 3 Fed. (2d) 547.

See, also, *Royal Insurance Co. v. Beatty,* 119 Pa. St. 6, 12 Atl. 607, 4 Am. St. Rep. 622; *Weishut v. Layton & Layton,* 5 Boyces (Del.) 364, 93 Atl. 1057.

Respondent contends that an offer was made by him to the appellants, who, by silence, assented, and that a contract resulted. The evidence is clear that the offer was never accepted.

On October 26, 1927, the respondent and the appellants were in the office of counsel for the iron works. At that time, so counsel for the iron works testified, respondent stated that he felt he ought to have something for the interest he had in the patents. That was the only offer made. The court found that, after that offer was made, no further communication was had between the parties until subsequent to the execution of the option. ''After the plaintiff so notified the defendants . . . there was no further communication between the parties until after the execution of said option agreement on the 28th day of October, 1927.'' Counsel representing the iron works at that time testified as follows:

''Mr. Troyer said he felt he ought to have something for the interest he had in the patents. He said he thought he was entitled to some consideration or payment for his interest in those patents. I know that when that statement was made there was silence for a half second, and then John Fox turned to Troyer and said: 'Well, now, I think you have been pretty well taken care of by me and the Seattle-Astoria Iron Works. I have favored you on stock transactions and you have done pretty well by that.' Mr. Fox became very much annoyed and said there was nothing for him to consider in the matter. There was considerable

silence. It seemed to create a feeling. Chester Fox spoke up and said something to the effect: 'Well, now, if we decide to do anything for you, how do you want it, in stock or cash?' Mr. Fox, Sr., got up and left the room in an angry spirit and I think the other men went right out afterwards.''

Answering a question by the court, this same witness testified:

''All I can testify is that Mr. Troyer raised that question, Mr. Fox resented it—he seemed to grow mad about it, and did not agree to anything at all. . . . The question was never raised again afterwards in the signing of the option. The parties came in and signed the papers, and it was not discussed when they signed them. I presumed it was settled up between themselves and he had abandoned it.''

The witness further testified that, after the option had been delivered, respondent Troyer visited him one day and said:

''We never came to any conclusion or reached any settlement in this matter, and I have talked to Mr. Fox, mentioned it to him once, and the other day, and he has not said anything about it and does not seem to want to discuss the matter at all.''

Respondent Troyer testified that, at the meeting of October 26, 1927, he brought up the question of his receiving pay for his interest in the patents; that he had figured that the amount should be twenty-five thousand dollars; that thereupon Chester Fox spoke up and said, ''How do you want it, stock or cash?''

''Q. And then what happened? A. Then I turned to John Fox and he practically quoted the general substance of these resolutions we spoke of, especially in the event of the patentee severing his connections with the company, the company is to have the refusal of this half interest in any patent he may own. Q. Was anything else said at the time? A. No.''

Clearly, there was no meeting of minds. The offer was rejected. In his indignation, appellant John Fox left the conference, refusing to talk about the matter. A few days later, the option was signed. The matter was not referred to again by Troyer. He did not renew his offer to the appellants, or insist that an agreement be made to pay him for his patent interests. Respondent Troyer so testified:

"Q. Was there any other meeting between you and Mr. Fox in the meantime? A. We were having a meeting practically every day. Q. (By the Court): There was nothing else said between you and the Foxes at all as to your value of $25,000 except that you have detailed here? A. Yes. Q. (By the Court): Never was referred to again? A. Not until after the option agreement was signed."

Though meeting with the Foxes practically every day, the respondent did not again bring up the matter until after the option agreement was signed. The respondent never believed that he and the appellants had come to an agreement respecting the patent interests of the former.

The respondent testified that, several weeks after the option was signed, he asked Chester Fox whether they had got together on it, to which Chester Fox replied in the negative. Troyer said he would like to see the appellants get together on the matter and have the thing arranged. This doubtless refers to the testimony that, subsequent to the signing of the option, the appellants and the respondent discussed the matter of having the stockholders of the iron works get together and agree to pay Troyer something. Respondent testified that, in a conversation with John Fox in the spring of 1928,

"We both agreed that there was evidently a misunderstanding between us on the subject. We both de-

cided that there was evidently a misunderstanding between us."

Another witness at the October 26, 1927, conference testified that, when the question of payment to the respondent arose, Mr. Fox became very angry, read or quoted from the resolution (the option of the iron works to purchase respondent's patent interests), and told the respondent:

"You have had enough out of this proposition, or that you have been well paid. There was nothing further said. Everybody shut up like a clam, and there was nothing further said about that. Q. Did that end the conversation on that question? A. My recollection is I testified that that stopped right there. They went ahead with the reading of the option and nothing more was said. Q. In that meeting, in Mr. Kane's office when the matter was brought up, and Chester said, 'Well, how do you want it, in money or stock,' and Mr. Troyer answered it didn't make any difference, it was after that John Fox read the resolution? A. Yes, sir. Q. (by the Court): There was nothing said right then and there—you or none of the Foxes said 'We won't pay you anything,' or 'We won't do it?' A. No, there was nothing said."

Appellant John Fox testified that Troyer brought up the question about his equity saying, "It is about time to hear from Mr. Fox," to which Mr. Fox replied:

"I said, 'You have nothing coming.' We had our salary and drew our pay and then to make a separate claim for something that we could not use or was of no use to us, and he had no claim against us in any way, we were selling everything we had for this stock of the company and he was doing the same, and if there was anything that he could get in money out of his interest at all he should have got it from the person who purchased the interest, but I did not think he had a claim, even, until he died. After my statement I do not think there was anything said. I think that broke up the meeting."

Appellant Chester Fox testified:

"I do not believe that he ever made it plain that he wanted us to pay him, because he always wanted me to get a meeting of the stockholders of the company— to talk to them about this payment to him. I felt I did not have anything to say to the stockholders, it was up to him to call a meeting. This request for a stockholders' meeting was after the option was exercised. He may have done so before the option was exercised, but not until after the option papers were all signed."

The inquiry of Chester Fox was not an assent to the suggestion of the respondent that he be paid for his patent interests, as the trial court stated. It is no more than an inquiry for more specific details of the respondent's proposition. The respondent stated he replied, "I don't care, either way, it is immaterial." That proposition was not accepted. That was followed by appellant John Fox's reading the resolution. Nothing further was said, and the court so found.

The statements made by respondent, subsequent to the placing of the stock and the patent assignments in escrow, clearly disclose that respondent knew that no agreement was ever made by him with the appellants. The respondent testified that his impression of the whole affair was as stated in his letter of March 9, 1928; "that is, that there were two ways for adjustment, one to sell my interest to the Continental, and the other the iron works to pay my share." His letter of March 9th, 1928, reads, in part, as follows:

"I looked upon the situation as having two ways for adjustment, when selling out the business to the Continental Can Co., one that I would arrange the sale of my interests to the Continental and the other that we sell the business first and let the S. A. I. pay my share. That is the reason I brought up the question in Mr. Kane's office prior to signing the option, and from the

statements made I got the impression that the latter method was satisfactory.''

Thus, the respondent admits that, from the statements made in the office of the counsel for the Seattle-Astoria Iron Works, he got the impression that the iron works would pay his share, and not that the appellants, two of its stockholders, would do it.

To further review the testimony would unreasonably extend this opinion. It matters not whether the claimed agreement be considered as an express or implied contract. The result will be the same. An implied contract differs not from an express contract, except in the mode of proof. Both grow out of the intentions of the parties to the transaction, and *there must be a meeting of minds* whether the contract be express or implied.

''A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed in the light of surrounding circumstances, and not from their words either spoken or written. Like an express contract, it grows out of the intentions of the parties to the transaction, and there must be a meeting of minds. Such a contract differs from an express contract only in the mode of proof.'' *Western Oil Refining Co. v. Underwood,* 83 Ind. App. 488, 149 N. E. 85.

The judgment is reversed, and the cause remanded with directions to dismiss the action.

TOLMAN, C. J., PARKER, BEELER, and FULLERTON, JJ., concur.