Bernard **ASHEIM**, Plaintiff,

v.

**PIGEON HOLE PARKING, INC.**, a corporation, Vaughn Sanders, Leo Sanders, and Lawrence L. McLean, Defendants.

No. 1165.

United States District Court
E. D. Washington, N. D.
July 30, 1959.

Lenon & Willner, Portland, Ore., Howard Dent, Jr., Gardiner, Wash., for plaintiff.

Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., Cornelius & Cornelius, Spokane, Wash., for defendants.

RYAN, Chief Judge of the Southern District of New York, sitting by assignment.

This suit was filed on February 8, 1954, by plaintiff Bernard Asheim, a citizen of Oregon, against defendants Pigeon Hole Parking, Inc., a Washington corporation, and Vaughn Sanders and Leo Sanders, citizens of Washington. Lawrence L. McLean, also a citizen of Washington, was added as a party defendant on July 14, 1954.

Vaughn Sanders is the President, Leo Sanders, the Vice President, and Lawrence L. McLean, the Managing Director and Assistant Secretary of defendant Pigeon Hole Parking, Inc. All three are directors and stockholders of the corporation.

The suit arises out of the relations and dealings of Asheim with Pigeon Hole Parking during which he functioned part of the time under a franchise or agency agreement with Pigeon Hole Parking in the marketing and selling of installations for the off-street mechanical parking of automobiles in a structure containing tiers of automobile storage stalls or bins. The complaint states four separate counts, labeled as "separate and distinct causes of action"; all seek a money judgment.

This Court has jurisdiction by reason of diversity of citizenship, and the requisite jurisdictional amount is involved in the suit.

The first count, sounding in tort, is stated against all four defendants, and

alleges plaintiff has been damaged by their alleged wrongful acts in the sum of $2,246,400.

The second count alleges a claim in contract against the corporate defendant only, and seeks recovery in the sum of $93,600.

The third count seems to state a claim sounding in contract against the corporate defendant only, and asks for damages in the sum of $2,543,750.

The fourth count is phrased to state a claim in tort (and apparently to recover for the same and identical damage alleged to have been sustained in the "third" count) against the individual defendants. The gravamen of this fourth claim is the allegation "that the individual defendants conspired and colluded with each other and with third parties maliciously and wrongfully to prevent plaintiff from performing under the terms of his franchise agreement with the defendant corporation thereby preventing plaintiff "from performing under said contract and said contract has become valueless."

The defendants by answer served on July 23, 1954, have in substance denied any and all of the wrongful acts alleged by plaintiff, or that there are any monies due or recoverable of them by the plaintiff. The defendants "specifically deny that any fraudulent claims were made concerning said patents as alleged in plaintiff's first cause of action, or in any other fraudulent manner at all."

A cross-complaint is pleaded by the corporate defendant in which, as plaintiff, it seeks to recover of Asheim $74,880 in damages for his alleged tortious and unlawful interference with its dealings and negotiations with General Realty and Utilities Corporation, a prospective customer and purchaser of the Pigeon Hole Parking equipment.

The negotiations and dealings between Asheim and the defendants which are in suit began in the month of August, 1952, during what seems to have been friendly contacts between them, and there were talks concerning the Pigeon Hole Park-

ing apparatus and the granting of a franchise by Pigeon Hole Parking to Asheim.

The first count of the complaint evolves primarily out of the dealings plaintiff had with defendant Pigeon Hole Parking just prior to a trip by him to the East and to New York in the early fall of 1952, and his negotiations with Pigeon Hole Parking while in New York and immediately following his return to his home in Portland, after this journey.

The crux of this claim of plaintiff is stated in Item "7" of the pretrial order listed under the heading of "Plaintiff's Contentions". Here, plaintiff alleges he was cheated and defrauded by the joint and wrongful acts of all the defendants.

It is the claim of plaintiff "that prior to September 13, 1952, defendants made certain written and oral representations to plaintiff concerning the validity and extent" of the Pigeon Hole Parking patent protection; that they "represented that they had patent protection on a broad combination of structure, mobile elevator and lift carriage or dolly"; that these statements were material to the subject matter of the transactions then being had between the parties; and were made by the defendants with intent that plaintiff rely upon them, and that they were relied upon by the plaintiff; that the statements were false and untrue in that "the names of all of the inventors were not included on the patent application, No. 110296", and in that "the broad patent coverage that they claimed had previously been denied to them and abandoned by them", and in that the "claims as allowable were all restricted to the specific arrangement of parts in the lift carriage or dolly," and in that the patents were invalid; all to plaintiff's damage resulting from his reliance upon such representations, and his ignorance of their falsity.

Preparatory to his traveling, Asheim wanted to get some writing from Pigeon Hole Parking which would state and set forth the terms of a franchise which he might acquire of wide territorial limits, within the continental United States,

Canada, Hawaii, and Alaska, excepting only the certain cities, areas and states which were subject to preexisting franchises. Accordingly, Pigeon Hole Parking addressed and sent a letter to Asheim under date of August 28, 1952 (Plaintiff's Exhibit 55 in evidence). This letter, written by E. A. Cornelius in response to a letter from Asheim of August 21, 1952, set forth the terms and conditions of a "suggested agreement" which stated that "it should not be taken as binding on either party until the final contract is approved" by the Directors and possibly by a special meeting of the Pigeon Hole Parking stockholders.

Thereafter, on September 2, 1952, plaintiff Asheim wrote Vaughn Sanders, sending an agreement which he proposed to Pigeon Hole Parking, covering efforts plaintiff proposed to make to secure from New York people financial backing for a franchise for Pigeon Hole Parking; this proposal was not accepted by Pigeon Hole Parking, and it did not accept or sign the agreement Asheim submitted in his letter.

Following this, and between September 7 and 12, 1952, Asheim met with Vaughn Sanders and McLean on a number of occasions. There was then talk about the patent situation, and there was shown to Asheim a copy of a letter from Glenn Fish, the Pigeon Hole Parking patent lawyer. This letter was dated July 29, 1952 and was addressed to Pigeon Hole Parking, Inc.

The letter from Fish recited that it was written in response to the request of Pigeon Hole Parking that he (Fish), "briefly state the substance of your allowed application Serial Number 110,-296." It stated that, "Five claims have been deemed allowable by the examiner." It also set forth the writer's opinion as to the extent of these claims in the following language:

"We believe that your claims as allowed fully cover a structure of tiered storage stalls positioned at one or both sides of an elevator capable of being operated both horizontally and vertically; said elevator supporting a longitudinally shiftable vehicle lift carriage movable onto and off of the elevator by mechanical means."

The letter expressed the writer's hope of anticipating "securing further protection for you on various portions of the structure when the pending applications issue into patents", but the letter noted that "it is useless to ponder the degree of protection which may be derived until the prosecution has progressed further."

This was followed by another letter dated September 17, 1952, addressed to Asheim by Pigeon Hole Parking (Plaintiff's Exhibit 58 in evidence), to which was attached a letter of transmittal dated the same day, also sent to Asheim by Pigeon Hole Parking (Plaintiff's Exhibit 59).

Exhibit 58, in the opening sentence, reads:

"The letter which Mr. Cornelius wrote you, dated August 28, contained in substance the provisions that we feel should be in the contract proposed between our company and yourself."

Exhibit 58 further states:

"We are again outlining the provisions which we desire in the contract."

And there followed and was reiterated the substance of the provisions and conditions set forth in the prior letter of E. A. Cornelius to Asheim, under date of August 28, 1952 (Plaintiff's Exhibit 55).

The accompanying letter (Plaintiff's Exhibit 59) is significant in that, although brief and concise in content, it set forth that,

"The proposed offer of a franchise outlined in the attached letter will be kept open for a period of two weeks after Monday, September 22, but in the meantime, this company reserves the right to do business as usual including selling units if the occasion should arise."

Asheim testified that this two-week period set for acceptance was extended by subsequent oral agreement made by him

with Pigeon Hole Parking. Crediting this testimony of Asheim as fact (which we do not), it nevertheless stands clear that the offer to grant a franchise on the express terms set forth in these three exhibits was never accepted by Asheim, and no contract resulted from an acceptance of the offer so made.

It was after Asheim received these three letters (Exhibit 55, Exhibit 58, and Exhibit 59) that he went to New York, acting solely on his own behalf, in an endeavor to secure financial support which would enable him to accept this franchise offer, or to interest someone with sufficient capital willing to undertake the venture and permit him to participate or share in the profits.

He stopped at Cleveland on his way to New York to see one concern (R. A. McCormick Company) to whom Pigeon Hole Parking had referred him, but it is of no moment for nothing resulted from this visit. There is no doubt, however, that in New York Asheim was in contact with, and negotiated with some responsible and successful businessmen. It is not necessary to detail his activities in New York. It is sufficient to note that he met with and negotiated with the president of General Realty and Utilities Corporation, a corporation which had large and important realty investments in New York and the vicinity, and which owned or controlled many large metropolitan office and other buildings, as well as some choice commercial properties. During his negotiations with this company he discussed the possibility of erecting a Pigeon Hole Parking installation on one of its properties located at 720 Third Avenue, between 45th and 46th Streets in New York City. This was a valuable realty location. We should note, also, that he met with S. D. Leidesdorf & Co., certified public accountants of national standing, with important clients and associations in the realty, promotion, and investment banking fields; and that he had conferences with individuals of means and wealth, and with Lehman & Co., investment bankers.

But, the net result of all the endeavors of Asheim is found expressed in Exhibits 62, 73, 74, 76, and 85. These interests were not ready and willing to accept the terms of the proffered offer of franchise from Pigeon Hole Parking which Asheim had brought with him to New York. They made a counter offer which varied in many important and substantial provisions and conditions from the proposals and offer made by Pigeon Hole Parking. This defendant, acting within its lawful right to sell or dispose of its property on its own terms, rejected this counter offer and refused to accept it. No unlawful interference, tortious wrong, or breach of any contractual obligation by any of the defendants impeded or hampered Asheim in these negotiations, or contributed to the fact that they were unproductive. Solely, then, through the failure of his own efforts, Asheim found his trip to New York unsuccessful, and he did not accept the offer of Pigeon Hole Parking.

Exactly how, and in what manner, this plaintiff hopes to recover on this first claim, it is most difficult to understand.

Asheim charges that he was deceived and defrauded by Pigeon Hole Parking and the individual defendants, and that his failure was due to their fraud. Asheim charges that he was defrauded by misrepresentations set forth in his answers to Interrogatories propounded by the Court at the commencement of the trial.

Asheim alleges with respect to the first count of his complaint that, the contents of the letter (Exhibit 49), which Fish sent to his client Pigeon Hole Parking, contained false and fraudulent statements, particularly with respect to the portions of the letter which we have quoted verbatim.

We must observe that the letter was sent by Fish after five claims of the patent application Serial No. 110,296 had been allowed by the Examiner on July 15, 1952, and that they were fully familiar with the contents of the patent application and of the claims made in it, for

both of the Sanders brothers had signed and verified it as co-inventors. Then, too, it is phrased in language which gives to a reader the distinct impression that it is but the statement of a professional opinion as to the scope and extent of the allowed claims and of the patent protection afforded by them. The closing sentence in plain language states the ever present problem of patent applications and the uncertainty of their true value and worth "until the prosecution has progressed further" and the patent issued. The opinion expressed was not so recklessly or carelessly made, without support in fact, as to make it a false, fraudulent, or misleading statement. There is certainly no evidence that Fish intended to defraud Asheim, or anyone else who might be shown the letter; nor is there any credible evidence that any of the defendants knew or believed it to be false or fraudulent; or intended by its use and exhibition to Asheim to deceive either him or those to whom he might submit the letter. The best indication that the defendants believed the letter of Fish' to be the truth and an honest and fair statement as to the patent application, and as to the allowed claims, is that the defendants gave a copy of it to Asheim of their own volition, and without reservation or restriction as to its use by him.

Indeed, when we examine the file wrapper of the application (Exhibit 2), which was filed on August 15, 1949, and on which Patent No. 2626065 issued on January 20, 1953, we find that the letter was entirely fair and correct.

The application recites that the "invention relates to charging and discharging apparatus in the general class of material and article handling"; that "the power operated appliance or apparatus is designed for service with a storage structure"; that "the parking apparatus is propelled and operated for successively depositing incoming vehicles in selected storage spaces, at desired heights"; and that "with equal facility the apparatus is utilized for successively withdrawing outgoing vehicles from storage

and discharging them". The application describes the function and purpose of the parking apparatus and states that "the invention consists in certain novel features of construction and combinations and arrangements of parts." When the allowed claims are carefully read and examined we do not find the statements in Fish's letter to be without support in the File Wrapper and Contents of the Patent File (Exhibit 2).

We find too, from the evidence, that Asheim was not deceived or defrauded by these exhibits 46, 49, and 50, or by any of them; or by any statement or representation made by any of the defendants.

The plaintiff Asheim also alleges with respect to this first count that the defendant Vaughn Sanders falsely stated to him, Asheim, in the month of May, 1952, in Portland, Oregon, substantially as follows:

"That we have just been allowed three more patents; that they are very broad and basic and that they were much better than we ever expected or hoped to get. That these patents will cover many things other than automobile storage. That we have basic patents on the only two-way telescope ever invented."

And the plaintiff Asheim also alleges further that this statement was in substance and content repeated and again represented to him (Asheim) by both Vaughn and Leo Sanders in the month of August, 1952, again in Portland, Oregon. And Asheim also alleges that during the last week of August, or the first week of September, 1952, in Spokane, Washington, these same defendants did falsely state and represent to him substantially as follows:

"We have been granted our patents and * * * we are giving you these papers to assist you in your efforts in selling"

at which time Exhibits 46, 49 and 50, along with a drawing of the steel structure used for Pigeon Hole Parking storage, were handed to the plaintiff.

First, we give consideration to the last of these alleged statements. We have found that the defendants did give to Asheim, prior to his trip to the East, the three papers, Exhibits 46, 49 and 50. We now find that they did so with the good purpose and honest intention of assisting him in his efforts to sell or promote the sale of Pigeon Hole Parking installations to his benefit and profit, and without an intent or motive to cheat or defraud him in any manner.

Then, we find from an examination of the Patent Office File Wrapper and Contents of the Application File No. 110296 (Exhibit 2), that application Claim No. 11 was filed on September 18, 1950, and was allowed by the Examiner on May 23, 1951, and is Claim No. 1 in the Patent No. 2626065, when issued on January 20, 1953; that application Claim No. 12, filed on September 18, 1950, was allowed on May 23, 1951, and is Claim No. 2 of the Patent; that application Claim No. 13, filed on June 19, 1951, was allowed on July 15, 1952, and is Claim No. 3 of the patent; that application Claim No. 14, filed on June 19, 1951, was allowed on July 15, 1952, and is Claim No. 4 of the patent; and that application Claim No. 15, filed on June 19, 1951, was allowed on March 28, 1952, and is Claim No. 5 of the patent.

We find that none of the defendants at the times alleged, or at any other time, made any false or fraudulent statement to Asheim concerning the patent application, the scope of the claims allowed, or of any material matter affecting the patent application, its claims, or the patent protection.

The plaintiff Asheim also alleges that the defendants defrauded him by representing to him that Leo and Vaughn Sanders, who had filed the patent application No. 110296, were the original, first and joint inventors of the invention described in the application, when in truth there was another who was the inventor or a joint inventor with them, and that, therefore, the patent which issued is invalid. Asheim has also at times contended in this suit that the claims allowed were abandoned during the processing of the patent application, and that, therefore, the claims allowed in the patent are invalid.

Thus, one of the false representations by which plaintiff alleges that he was misled, defrauded and deceived, was a statement that Pigeon Hole Parking had a valid patent. We may not ultimately determine the validity of the patent in this suit, for infringement by Pigeon Hole Parking is not charged, and a declaratory judgment of invalidity is not sought by plaintiff.

The validity of the patent may become relevant and material only if it is found that a representation was made as to its validity, and if so found, then only to ascertain the truthfulness or the falsity of such a representation.

We find on the evidence presented that, Leo and Vaughn Sanders were the original, first and joint inventors of the apparatus and device described in the patent application and in the patent. We also find for the purposes of this suit that they alone first conceived the idea of the invention and first reduced it to practice; and that they conceived the idea and reduced it to practice prior to the filing of the patent application. We conclude for the purposes of this suit that the patent is not invalid because Leo and Vaughn Sanders were not the original, first and joint inventors.

Since jurisdiction is predicated on diversity, we must apply state law; and it is stipulated that plaintiff's rights as to all the claims alleged are to be measured by the law of the state of Washington. The decided and reported cases on fraud in Washington are in great number and there appears to be no conflict as to what constitutes actionable fraud.

The nine essential elements of a cause of action for fraud have been reiterated in case after case by the Supreme Court of Washington. Webster v. L. Romano Engineering Corp., 1934, 178 Wash. 118, 120–121, 34 P.2d 428, 430; Peoples National Bank of Wash-

ington v. Brown, 1950, 37 Wash.2d 49, 60, 221 P.2d 530, 536; Graff v. Geisel, 1951, 39 Wash.2d 131, 141, 234 P.2d 884, 889–890; Puget Sound National Bank v. McMahon, Wash.1958, 330 P.2d 559, 560.

"These are: (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage." Webster v. L. Romano Engineering Corp., supra, 34 P.2d 430.

Failure of proof of a single one of the nine essential elements bars recovery in a fraud action. Loehr v. Manning, 1954, 44 Wash.2d 908, 272 P.2d 133. In Puget Sound National Bank v. McMahon, supra, 330 P.2d at page 560, the Court reiterated the rule:

"In an action for fraud, the burden is upon plaintiff to prove the existence of *all* the essential and necessary elements 'that enter into its composition' * * *. All of the ingredients must be found to exist. The absence of any one of them is fatal to a recovery." 330 P.2d at pages 560–561.

■ The burden of proof upon the plaintiff is particularly heavy because, in Washington, as in many jurisdictions, the presumption of innocence of fraud is almost as strong as "the presumption * * * of innocence of crime." See Dobbin v. Pacific Coast Coal Co., 1946, 25 Wash.2d 190, 202, 170 P.2d 642, 648:

" 'It follows from the rule that fraud will not be presumed that the burden of proving fraud rests on the party who relies on it either for the purpose of attack or defense.

" 'The rules which impose the burden of proof on one alleging fraud and which deny a presumption of fraud rest on the fact that fraud is regarded as criminal in its essence, and involves moral turpitude, at least, while, on the other hand, the presumption is that all men are honest, that individuals deal fairly and honestly, that private transactions are fair and regular, and that participants act in honesty and good faith. The presumption is against the existence of fraud and in favor of innocence, *the presumption against fraud approximating in strength the presumption of innocence of crime.' "

The plaintiff, Asheim, does not contend that there was a wilful concealment or withholding of any information concerning the Pigeon Hole Parking patent situation, or of the scope of the claims allowed. Nor does plaintiff maintain that there was a breach of a relationship of trust and confidence (which arose from their dealings), or that such a breach flowed from silence when there was present a duty to speak and to disclose a matter material to their negotiations.

The plaintiff, Asheim, does charge, however, that he was deceived and defrauded by the false and fraudulent representations made, which have been stated specifically by the plaintiff in response to interrogatories propounded by the Court. These specifications we have set forth above at length.

It is hornbook law that,

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law, for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation." Restatement of Torts, § 525, p. 59.

When inquiring as to whether Asheim might have been misled, deceived, or defrauded by a false statement or fraudulent representation of the defendants— assuming arguendo that such statement

was in fact and in law made, contrary to our finding—we must be mindful of Asheim's education, his special studies, and his prior dealings with Pigeon Hole Parking.

Asheim impressed us as he testified, as being of extremely keen intellect, exceptionally alert, and thoroughly experienced in business and financial dealings. He had some college education and had successfully completed one year of study at a recognized and accredited law school. He had studied and passed a course given on the law of contracts and on the law of torts. He was astute and competent to conduct complicated and involved negotiations with men who occupy positions of great prominence in New York in the promotion of projects involving large and substantial amounts of money, of corporate financing, of real estate transactions, and in investment banking. The evidence demonstrates his ability and capacity; he was not a novice or ignorant of the ways and methods of the modern business world.

Asheim was accustomed to making his own investigations and surveys of all matters related to, or involved in his business transactions.

When he began to negotiate for financial support to undertake the franchise offered by Exhibits 55, 58 and 59, he had the experience gained from his operations under a prior franchise granted to him by Pigeon Hole Parking for the Portland, Oregon, area. He had successfully promoted and sold the Pigeon Hole Parking installations to two investors in Portland, and apparently at some profit to himself. It is but fair to conclude that these remunerative operations served as the impetus for him to seek and request of Pigeon Hole Parking the further franchises covering broader districts and areas. He entered these negotiations under no delusions, and was not induced to continue his dealings with Pigeon Hole Parking by reason of fraud, deception, or misrepresentation perpetrated by the defendants, or any of them. He was not deceived, defrauded or misled; his claim pleaded in the first count of his complaint is without support either in fact or in law.

We further find that Asheim's failure to accept this offer did not result or flow from any false or fraudulent statement or misrepresentation made by any of the defendants at any time. The evidence offered—indeed, by the plaintiff Asheim himself—clearly establishes that Asheim did not accept the offer because he was unable to secure financial backing from the New York interests he had approached and to whom he had submitted the offer; that these interests only made a counter offer and proposal, which was rejected by Pigeon Hole Parking.

We conclude that plaintiff Asheim has entirely failed to establish by a preponderance of the creditable evidence the first count or "cause of action" of his complaint, and judgment thereon, upon the merits, is directed in favor of the defendants.

We come then to a consideration of plaintiff Asheim's second claim or "cause of action."

Here, Asheim states his contentions in the pretrial order:

"That during the months of September, October, and November, 1952, plaintiff made arrangements for the sale of a six-level Pigeon Hole Garage at 720 Third Avenue, New York City, New York, having a capacity of 312 car spaces to the General Realty and Utilities Corporation.";

and

"That in November 1952, defendants refused to sell the Pigeon Hole Parking facility as arranged for by plaintiff to General Realty and Utilities Corporation.";

and that defendants

"on August 3, 1953 sold to a wholly-owned subsidiary of General Realty and Utilities Corporation, the identical Pigeon Hole installation for

which plaintiff had previously arranged the sale.";

and that the plaintiff Asheim was therefore damaged in the sum of $93,600.

We have found that during his stay in New York City in the fall of 1952, Asheim did have conferences with officials of the General Realty and Utilities Corporation, and did discuss with them the possibility of erecting a Pigeon Hole Parking installation on its property at 720 Third Avenue, New York City; but at no time did the matter progress beyond the discussion stage. Specifically, we find that Asheim did not then, or at any other time, "make arrangements for the sale" of a Pigeon Hole Garage or installation with that corporation, or anyone else, at 720 Third Avenue, New York City, or at any other location in New York City.

Asheim went to New York City on September 21, 1952, in his efforts to secure financial backing. He was not successful. He did not go to New York as the agent or representative of the defendants, or any of them; he had no authority, written or oral, to act for them or on their behalf; and he then held no franchise for New York City.

It is not in dispute that an agreement was made on August 3, 1953, by Pigeon Hole Construction Co. and 720 Third Avenue Corporation for a Pigeon Hole Parking installation at that location in New York City (Exhibit 126). The contract by its terms was made contingent upon the approval of building plans by the City of New York, and provision was made that

> " * * * in the event that the City of New York fails or refuses to approve said building plans by August 31st 1953, then and in that event, at the option of the Owner, this contract shall terminate and each of the parties hereto shall be relieved of all liability hereunder, except that the contractor may retain said sum of $4000.00 as liquidated damages."

It is undisputed that the Pigeon Hole Parking installation was never erected at 720 Third Avenue, New York City, and that the building plans filed were never approved by the duly constituted bureaus, departments, and Commissions of the City of New York. Nevertheless, Asheim claims there is due to him by reason of his never completed and unconsummated transaction, $93,600. Exactly by what permissible method he computes this amount of alleged damage is not too clear.

Asheim had no express contract for his employment on the venture, and he had no agreement providing for definite and set compensation on this transaction; he does not allege that he did, nor has he proved such an agreement. He does seek, however, to recover what he alleges to be the reasonable value of his services and work in conjunction with this transaction. In substance, he alleges he rendered the defendant corporation services of value at its request and with its consent, and seeks recovery for what he alleges is the reasonable value of these services; in sum, Asheim seeks recovery for a quantum meruit compensation on an implied contract.

It has been repeatedly held in Washington that, to prove an implied contract the party claiming the benefit of such a contract must establish that there was a meeting of the minds of the parties on the terms of the implied contract. McKevitt v. Golden Age Breweries, Inc., 14 Wash.2d 50, 126 P.2d 1077; Kellogg v. Gleeson, 27 Wash.2d 501, 178 P.2d 969; Richards v. Kuppinger, 46 Wash.2d 62, 278 P.2d 395, 398. In the last-cited case the court wrote:

> "It is perfectly clear that there was no meeting of the minds between appellant and respondent, and hence no express contract of sale. Nor can we find any 'implied contract' between them. Both express and implied contracts grow out of the intention of the contracting parties and in each case there must be a meeting of the minds before there can be a contract."

In Troyer v. Fox, 162 Wash. 537, at page 554, 298 P. 733, at page 739, 77 A. L.R. 1132, where plaintiff sued for the value of patent rights he had transferred, the court said:

"* * * It matters not whether the claimed agreement be considered as an express or implied contract. The result will be the same. An implied contract differs not from an express contract except in the mode of proof. Both grow out of the intentions of the parties to the transaction, and *there must be a meeting of minds* whether the contract be express or implied.

"'A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed in the light of surrounding circumstances, and not from their words either spoken or written. Like an express contract, it grows out of the intentions of the parties to the transaction, and there must be a meeting of minds. Such a contract differs from an express contract only in the mode of proof.' Western Oil Refining Co. v. Underwood, 83 Ind.App. 488, 149 N.E. 85, 86." (Italics by the Court.)

■■■ There may be no recovery on implied contract on this second claim for the same reason that there may be no recovery on express contract. The parties never agreed on the terms of any contract.

Plaintiff, on the strength of the terms of the offer he had, tried to interest someone to invest or advance funds to allow him to accept the offer. The offer was never accepted in the terms offered.

He was unsuccessful in his effort to obtain the franchise right, and he is in no position to claim damages growing out of an implied contract. Either he must prove an express contract, or he may recover nothing. There is nothing in the conduct of the parties to establish a contract by implication. Certainly, Asheim, when he left for New York in September, 1952, to obtain financing to accept the proposed offer of franchise, knew he did not have a contract, but only an "offer." Neither he nor the defendants intended that he should be reimbursed for his expenses or efforts if he should be unsuccessful in his endeavor to raise money to accept the offer. There was no meeting of the minds for payment for the services for which he now seeks to recover.

We conclude, then, that plaintiff's second claim or "cause of action" should be dismissed on the merits, and that defendant corporation should have judgment thereon.

The third and fourth counts of the complaint may be considered together. After Asheim's return from New York and his inability and failure to accept the offer of Pigeon Hole Parking, a franchise covering a wide and extended territory, he still continued to negotiate and endeavored to secure a franchise for a smaller area. He was successful and received a further option. We pause to examine these negotiations and their results when appraising these two counts.

It is undisputed that by written agreement under date of November 24, 1952, Pigeon Hole Parking gave and granted to Asheim "an option to procure a franchise for the exclusive use, operation, licensing, leasing and selling all Pigeon Hole Parking equipment [in 21 states] in the States of New York, New Jersey, Tennessee, Alabama, Louisiana, Wisconsin, West Virginia, Arkansas, Mississippi, North Dakota, Montana, Kansas, Nebraska, Oklahoma, Iowa, Minnesota, Kentucky, Delaware, New Mexico, South Dakota and Wyoming * * *." The agreement (Plaintiff's Exhibit 91) further provided, in case this option was not exercised, for an "alternative Option" for an exclusive franchise for the "states of Wisconsin, Minnesota, Kansas, Nebraska, Iowa and Oklahoma." It was also provided that upon the exercise of the option granted, a formal "Franchise Agreement" was to be executed which would provide for "the States covered by the franchise", "the purchase price of the franchise", and "the total number of re-

quired installations." Payment of $10,000 to Pigeon Hole Parking by Asheim was provided for, the sum to be retained by Pigeon Hole Parking "until the 15th day of December, 1952, or until said Bernard Asheim shall notify the Pigeon Hole Parking, Inc. in writing that he intends to exercise said Option." Provision was also made that in the event of the exercise of the option, Asheim should on or before December 31, 1952, pay to Pigeon Hole Parking $140,000 in addition to the initial payment of $10,000, or a total of $150,000 as the first payment on a grand total purchase of the "Franchise Agreement" of $500,000; and that the balance should be paid—$100,000 on or before December 31, 1953; $100,000 on or before December 31, 1954; $100,000 on December 31, 1955, and $50,000 on or before December 31, 1956. As to the terms of a franchise, if exercised, Asheim was to be required "to order, purchase and install Pigeon Hole Parking equipment" in units with car parking spaces or stalls "for 1,200 cars during the calendar year 1953; 1,800 car spaces during the calendar year 1954; and 2,000 car spaces during each of the years 1955, 1956, 1957, 1958, 1959 and 1960, making a total of 15,000 required car spaces." The provision for the exercise of the alternate option included undertakings that the purchase price should be $40,000 inclusive of the initial payment of $10,000, and the balance, $10,000 on or before December 31, 1953; $10,000 on or before December 31, 1954; $10,000 on or before December 31, 1955; and that "the required installation shall be 200 car spaces per year for a period of eight years", and not less than 10 separate installations during that period. There was annexed to the agreement the form of contract to be signed in the event of the exercise of either of the territorial option provisions. It is important to note that it was provided "that no part of the $10,000 shall in any event be returned to the said Bernard Asheim", and that if neither option were exercised it "shall be the absolute property of Pigeon Hole Parking Inc., a corporation."

It is not disputed that prior to November 24, 1952, Pigeon Hole Parking had granted to parties other than Asheim exclusive franchises, as follows:

October      13, 1952 – California

November   4, 1952 – California, Delaware, Virginia and West Virginia

November 20, 1952 – Illinois, Michigan, Pennsylvania, Massachusetts and Connecticut

---

and that after November 24, 1952, Pigeon Hole Parking granted to a third party the following exclusive franchise:

December 18, 1952 – New York, New Jersey, Illinois, Michigan, Pennsylvania, Massachusetts, Connecticut and Florida

---

The execution of the agreement of November 24, 1952 (Plaintiff's Exhibit 91), with Asheim by Pigeon Hole Parking is admitted to be the voluntary, authorized, and binding obligation of Pigeon Hole Parking.

There is no dispute that Asheim paid Pigeon Hole Parking $10,000 at the time

of the execution of the agreement of November 24, 1952; that he has received a return of none of it; that he has made no other or further payments to Pigeon Hole Parking; and that Asheim did not install any Pigeon Hole Parking units or equipment during 1953, or thereafter.

It is also admitted that under date of December 15, 1952, Asheim wrote Pigeon Hole Parking a letter, a copy of which is annexed to the answer of the defendants (Defendants' Exhibit B). He wrote (in part):

1. "I am unable to exercise the option on the twenty-one states."

2. "Therefore, I am executing the purchase agreement for the six states and enclosing same. Kindly sign one copy of this agreement and return to me."

3. " * * * that my principals are not interested in the. larger territory."

4. "I cannot help but understand their reluctance to participate in a territory that is scattered geographically, and on vastly different terms than were presented to me."

It is to be noted that in this letter of December 15, 1952, Asheim made no demand for the return of the $10,000 which had been paid by him to Pigeon Hole Parking, and made no specific claim that he had been misled, deceived, or defrauded in any shape or manner by the defendants, or any of them. Asheim by this letter and the accompanying agreement (Defendants' Exhibit L) which he signed, exercised his alternative option for the six named states. Asheim testified on trial that he had filled in the several blank spaces in the agreement and that he had read it several times before he had signed it. In his own handwriting appear the names of the six states to which the franchise was limited.

This agreement specifically provided that

"Time is the essence of each and all of the provisions hereof.",

and Asheim was fully aware of the legal significance of this clause.

It has been settled by the pretrial order that "subsequent thereto the plaintiff and defendant corporation considered and conducted their affairs in such a manner that plaintiff had a franchise for the six states therein set forth."

There also appears no dispute as to the fact that on January 18, 1954, Pigeon Hole Parking sent to Asheim by registered mail a paper which it entitled "Notice of Forfeiture" (Defendants' Exhibit C), and that by this paper it was the purpose of Pigeon Hole Parking to notify Asheim that it deemed the agreement of December 15, 1952, terminated.

This "notice" recited the fact that Asheim had "failed to pay the sum of $10,000 which became due on or before December 31, 1953", and that he had "failed to install Pigeon Hole Parking units in the area covered by said contract", and had "neither ordered nor installed any Pigeon Hole Parking units since the date of said franchise."

It is against these undisputed facts that we weigh the contentions of the plaintiff as to these two remaining counts of his complaint. We have heretofore set forth plaintiff's contentions with respect to the fourth count of the complaint, and we later set forth his contentions with respect to the third count.

As bearing upon these counts, and particularly upon the fourth count, which is pleaded against the individual defendants, we observe that, under the applicable law of the state of Washington fraud and conspiracy are not presumed, but must be proven by clear, cogent and convincing evidence. In Cheesman v. Sathre, 45 Wash.2d 193, 273 P.2d 500, 502, it was written:

"We have repeatedly held that the plaintiff in an action for conspiracy to defraud must meet the burden of proving his case by clear, cogent, and convincing evidence. Harrington v. Richeson, 40 Wash.2d 557, 245 P.2d 191, and cases cited therein. By proposing proper instructions and taking exceptions to six

improper instructions given, appellants preserved their right to urge in this court that the trial court erred in instructing the jury that the alleged conspiracy could be proven by a mere preponderance of the evidence. Unquestionably the words 'clear, cogent, and convincing' mean something more than a mere preponderance of the evidence. Dovich v. Chief Consolidated Mining Co., 53 Utah 522, 174 P. 627."

█ Thus, in this suit the plaintiff has the burden of proving not just by the preponderance of the evidence that defendants were engaged in a conspiracy to defraud him. Plaintiff must establish this by clear, cogent, and convincing evidence.

Plaintiff's evidence in this case is not of this character and does not rise to this measure of proof.

After Asheim secured this six-state franchise, he went to Omaha sometime around March, 1953 to see the Gates City Steel Company in an effort to interest that company in financing some installations.

Prior to Asheim's visit to the Gates City Steel offices at Omaha this company, through one of its officials, J. O. Brelsford, had communicated with Pigeon Hole Parking concerning the possibility of doing business. Pigeon Hole Parking had referred the inquiry to Asheim and that led to his visit.

Gates City Steel had the largest steel warehouse located between Chicago and the Pacific Coast. It operated two fabricating plants—the main one at Omaha, Nebraska, and the other at Boise, Idaho. Asheim's contacts with Gates City Steel were primarily with Leland W. Browne, who, in 1953 and for some time prior thereto, was associated with that company and was its President. Browne's deposition is in evidence (Exhibit 226), and from it we learn that Gates City Steel had been exploring the matter of mechanical parking and the Pigeon Hole Parking installations before Asheim came to them. This had been carried on by Gates City Steel to a considerable degree and, in fact, it had a patent search run.

Browne has testified that in the talks with Asheim

"The main idea was to perhaps develop an operation in which we would be involved in the furnishing of the fabricated steel for installations in Bernie's [Asheim's] territory * * *."

And later Browne continued to narrate

" * * * we were approaching it from the standpoint of the possibility of our financing some installations and, perhaps, participating otherwise all from our standpoint pointing towards being in a position to furnish the fabricated steel that goes into each job."

Following some discussions with Asheim, Gates City Steel had its attorneys prepare a proposed agreement between Asheim and a corporation affiliated with, or controlled by Gates City Steel. This document is in evidence as Plaintiff's Exhibit 106. Browne explained that this agreement was a memorandum intended by Gates City Steel as the basis for its proposed action. He also testified that the transactions with Asheim involved some necessary approval from Pigeon Hole Parking to modify Asheim's six-state franchise to allow and permit what Gates City Steel was seeking and desired. This, Browne testified, primarily was that it, Gates City Steel, would furnish the steel for the Pigeon Hole Parking installations in the six-state franchise area.

Particularly as to this, Browne gave evidence that,

" * * * since the agreement required approval of modifications in Mr. Asheim's license, it was all predicated on reaching an agreement between Mr. Asheim and Pigeon Hole, which would enable us to go ahead * * *."

It was following the preparation of this proposed agreement (Exhibit 106) that Browne met with Asheim and Vaughn

Sanders (who came on to Omaha for the meeting), on April 1, 1953. Sanders made it plain that Pigeon Hole Parking would not consent to the modification, alteration of, or addition to Asheim's six-state franchise, and he also took the definite position that Pigeon Hole Parking did not want Gates City Steel to fabricate steel for the Pigeon Hole Parking installations even on a competitive basis.

The result of this meeting was an end of Asheim's dealings with Gates City Steel, and this followed solely from the fact that Pigeon Hole Parking would not consent to the changes in Asheim's franchise which Gates City Steel insisted upon having. It appears clear that Gates City Steel was interested in a participation only if it could fabricate the steel.

The status of the Pigeon Hole Parking patent which had issued on January 20, 1953, or the extent and scope of the applications and of the claims made, did not in any way influence or affect Asheim's negotiations with Gates City Steel, or bring about failure to achieve a final agreement, either between them or with Pigeon Hole Parking. As to this patent aspect of the dealings had, Browne testified:

"* * * we actually made a patent search ourselves and verified the existence of same";

and further:

"* * * we did run an independent search on it on our own before we went ahead with it."

Browne's testimony makes it clear that Gates City Steel was entirely satisfied and content with the Pigeon Hole Parking patent rights and their scope.

Pigeon Hole Parking was but exercising its legal rights under the franchise it had granted Asheim when it refused to consent to the modification sought; certainly, neither it nor any of the other defendants committed any actionable wrong.

Asheim has offered evidence of other contacts and negotiations that he conducted while operating under this six-state franchise. We feel it unnecessary, to review them in detail; it is sufficient to find that this evidence in no measure substantiates Asheim's claims.

In essence, it appears to be Asheim's contention that the defendants, acting jointly and unlawfully, did "purposely [make] * * * performance impossible in order that they could recapture their franchises after exploiting them for their own financial benefit." Asheim urges that the defendants sought to achieve this end by tortiously misrepresenting "every facet of Pigeon Hole Parking in their advertising material"; that they created the "Pigeon Hole Construction Company, a sham corporation, in order to get more profit for the defendants by adding an additional contractor's fee" to the cost of installations.

The short answer to these contentions is that the defendant Pigeon Hole Parking was well within its legal rights in setting the terms of the tendered franchises; the plaintiff, Asheim, accepted these terms and is bound by them. The agreement with Asheim provided for the participation of the Construction Company in the installations and Asheim knew of this. The trouble seems to be that Asheim, himself an individual of no mean ability, sought to direct the affairs of Pigeon Hole Parking, to dictate its business policies, and to modify and alter the provisions of his franchise. Pigeon Hole Parking had its own ideas and resisted these aggressive steps of Asheim; when Asheim could not gain his point, he felt aggrieved and wronged, but this attitude of his is not justified by the facts or the law.

We find nothing falsely presented or stated in the three brochures in evidence (Exhibits 35, 98, and 142), which in any shape, manner, or form made performance impossible by Asheim, or interfered with the enjoyment by him of his rights under the agreements he had.

Nor do we find in the evidence presented any support for an inference or finding that the three individual defendants maliciously or tortiously interfered

with Asheim's performance, or conspired or attempted to do so.

Of course, all of Asheim's testimony must be weighed against the fact that he, himself, is now the holder of a patent for a mechanical parking installation, or an integral part of such mechanism, and that he is interested in more than a mere monetary recovery. Asheim is presently a competitor of Pigeon Hole Parking.

Above all, it appears that no suit was ever filed by third parties against Asheim, when operating under his franchise, seeking injunctive relief against the exercise of his franchise because of a prior grant; or for infringement; or for a declaratory judgment of non-validity of the Pigeon Hole Parking patent. It stands uncontradicted that to date the validity of the Pigeon Hole Parking patent has never been challenged by court suit seeking a judgment of non-validity; nor has it ever been charged by suit that the Pigeon Hole Parking infringed on any other patent.

There is no evidence that Pigeon Hole Parking granted a franchise to anyone in violation of the terms of agreement it had with Asheim; or that it had granted one prior to the agreement which was operative and effective, in violation of the terms of the agreement; or which it concealed or failed to disclose to Asheim, to his damage.

█ We find and conclude that none of the individual defendants tortiously interfered with Asheim's performance, or conspired so to do; and, likewise, we find and conclude that Pigeon Hole Parking duly and faithfully performed under its agreement with Asheim, and at no time, by its own corporate acts, or acting by its individual officers, directors, or employees, did it interfere with, or make Asheim's performance impossible; or act or attempt to do so.

The third and fourth counts or "causes of action" of the complaint are dismissed and judgment is awarded the defendants upon the merits.

The defendant Pigeon Hole Parking submitted no evidence whatsoever to substantiate its cross-complaint pleaded against the plaintiff Asheim, and during trial this defendant consented to a dismissal of its cross-complaint.

The Court desires to record appreciation of the cooperation and assistance received from counsel in the conduct of the trial. The attorneys for all parties are very competent and able members of the Bar, and skilfully and carefully presented the evidence. Their work showed great care, intelligence, learning and industry.

Judgment directed to be entered forthwith in accordance with the foregoing findings and conclusions.