[No. 29789. Department Two. July 18, 1946.]

WESTERN ASPHALT COMPANY, *Respondent*, v. HENRIK VALLE
*et al., Appellants.*[1]

[1]Reported in 171 P. (2d) 159.

*John P. Lycette* and *Charles A. Spirk,* for appellants.

*Rummens & Griffin,* for respondent.

BEALS, C. J.—Western Asphalt Company, a Washington corporation, instituted this action against Henrik Valle and his wife, Ellen Stray Valle, alleging in its complaint its corporate existence, and that the defendants were husband and wife engaged in a general construction business under the name of Henrik Valle Company; that, during the month of July, 1944, the defendants were preparing to submit a bid for a general construction job involving the building of a naval advance base depot at Tacoma, Washington, in accordance with general plans and specifications, which included asphalt pavement and soil stabilization; that, at the request of defendants, plaintiff furnished them with its engineering services in computing costs relating to the asphalt pavement and soil stabilization portions of the general contract; that plaintiff's services, computations, and costs were, by plaintiff, furnished to defendants and were used by them in submitting their bid; that the computations and estimates furnished defendants by plaintiff aggregated $294,539.51, and that, aided by the facilities and computations furnished by plaintiff, defendants bid upon the contract and were the low bidder for the general contract for the entire construction, including the asphalt pavement and the soil stabilization; that defendants were awarded the general contract for approximately $1,996,000; that the reasonable value of the services performed by plaintiff for defendants was the sum of $43,000, for which amount plaintiff prayed for judgment.

Defendants admitted that they were husband and wife and engaged in business as alleged by plaintiff, and denied each and every other allegation contained in plaintiff's complaint, praying that the action be dismissed.

The cause was tried to a jury, which returned a verdict in favor of the defendants, whereupon plaintiff moved for judgment in its favor notwithstanding the verdict or, in the alternative, for a new trial, basing its motion for a new trial upon six of the statutory grounds.

The trial court denied plaintiff's motion for judgment in its favor notwithstanding the verdict, but granted plaintiff's motion for a new trial upon two grounds mentioned in the order as follows:

"1. Error of the Court in giving instruction No. 11 which was excepted to at the time by the plaintiff. 2. That the verdict is contrary to the evidence adduced at the trial and substantial justice has not been done."

From this order, the defendants have appealed to this court. We shall refer to appellant Henrik Valle as though he were the sole appellant.

Appellant assigns error upon the refusal of the trial court to grant his motion to dismiss the action, which motion was interposed at the close of respondent's case and renewed at the close of all the evidence; upon the order of the court granting respondent's motion for a new trial, and upon the refusal of the trial court to enter judgment in appellant's favor upon the verdict of the jury.

As appellant did not stand upon his motion to dismiss interposed at the close of respondent's case, but proceeded to introduce evidence on his own behalf, appellant's motion for judgment in his favor as matter of law made at the close of all the evidence is the only motion which may be considered on appeal.

The somewhat complicated facts may be stated as follows:

Respondent is engaged in the business of laying asphalt paving and similar work. While respondent occasionally directly contracted for the laying of asphalt, it more frequently entered into subcontracts with general construction contractors.

When respondent's officers learned that a contract in which it might be interested was about to be let, preparations would be made for bidding upon any desirable sub-

contract, and plans and specifications would be obtained to enable respondent to prepare necessary estimates. Information concerning these estimates would often be made available to any reputable general contractor who asked for them, the estimates being made so available to the general contractors because of respondent's desire to obtain from the successful bidder a subcontract for the installation of so much of the work as fell within the scope of respondent's activities. It does not appear that respondent ever made a charge for this service of furnishing estimates of prices, but apparently respondent had always received the subcontracts for the installation of asphalt paving when the general contractor to whom it had furnished data had been awarded the contract for the entire job.

About July 20, 1944, respondent learned that the United States government would open bids for the construction of the naval base advance depot at eleven a. m., July 28th, following. The construction included a substantial amount of asphaltic pavement, and July 22nd respondent's officers procured the plans and specifications from a general contractor who was expecting to file a bid. The specifications were introduced in evidence, and comprised thirty-two sections. Section 9, shown on six pages, provided for soil stabilization, and section 10, of three pages, covered the laying of asphaltic concrete. It was these two sections which interested respondent, whose plant was just across the street from the land upon which the naval base was to be built.

This was the largest contract with which respondent had ever been concerned, and its officers were anxious to obtain a subcontract for that portion of the work in which respondent was engaged. At the request of an officer of respondent, two competent persons computed the yardage required for the soil stabilization and for the asphaltic concrete. For this, respondent paid seventy-five dollars. Three of respondent's officers independently estimated the amount of asphaltic work to be done and the total price at which respondent would do the work. July 27th, the day before

the bids were to be opened, the three agreed upon a common figure as respondent's estimate. This estimate was typed upon respondent's letterhead, and without the name of any addressee reads as follows:

"Gentlemen:

"We are pleased to quote the following prices for furnishing all labor, equipment, supplies and materials necessary for completing asphalt pavement and soil stabilization at the Naval Advance Base Depot, Tacoma, Washington, in accordance with Sections 9 and 10 of plans and specifications and addenda thereto. Basic Bid Section 9—17¢ per square yard; Section 10—82¢ per square yard."

The estimate continued with certain statements concerning other portions of the contract, prices being included.

Page 1 includes the following:

"The foregoing quotations are unit prices. We based our figures upon the approximate areas shown on the attached sheet, but cannot guarantee those quantities. However, no change of unit price will be involved because of reasonable variation in quantities."

Upon an attached sheet is found the following:

"For your information and checking, our estimator obtained the figures listed below before issuance of addendum covering G-1 and G-2. We have been unable to obtain plans to figure those changes, as the Navy will not issue plans to Sub-Contractors.

"Minimum asphalt concrete area—300,745 square yards
"Minimum soil stabilization area—281,933 square yards"

During the afternoon of July 27th, a copy of the foregoing was furnished by request to each one of seven or eight of the general contractors who expected to bid on the job, the letters having been personally delivered.

At about eight o'clock in the morning of July 28th, Robert Allison, who was then in the employ of appellant as an estimator, and who was busily engaged in preparing appellant's bid for the naval base, which was to be submitted at eleven o'clock that morning, telephoned respondent's office in an effort to obtain information concerning respondent's estimates and prices for the work involved in the general construction contract concerning which respondent had

prepared estimates. Respondent's president, Mr. T. D. Tyrer, was absent from the office, but was informed by respondent's bookkeeper, Mrs. Eleanor Byers, concerning Mr. Allison's call.

At nine a. m., Mr. Tyrer telephoned Mr. Allison, and, concerning this conversation over the telephone, Mr. Tyrer testified as follows:

"Q. Did you call Mr. Allison then? A. Yes, I called him on the phone and he said he wanted our asphalt prices for the Tacoma Navy job. I asked him whom he was bidding with and he said he was working for Valle and wanted the figures for Valle. I told him that I did not have the figures in my head, that I had not memorized the areas, the addenda, and so forth, and as I was rushing to Tacoma right at that time there was nothing I could do for him. Then he told me he had been working on this bid for, I believe, a week and that he had worked all that night and had not been to bed; that he was down to the asphalt item and if he did not quote the asphaltic figures he could not bid the job. I asked him why he did not call earlier and he said he had thought the asphalt plant across the street from the site belonged to Harrison Brothers, but when he called them they told him it belonged to us and he would have to get his price from us. He seemed so upset and anxious that I told him if he would call the office and ask the girl there to give him our prices it would be all right with me."

Immediately after this conversation with Mr. Tyrer, Mr. Allison again telephoned respondent's office. Concerning this conversation, Mrs. Byers testified as follows:

"Q. State to the jury just what occurred with reference to that telephone call. A. I think it was at about eight o'clock in the morning that Mr. Allison called Mr. Tyrer on the telephone the first time that morning and said he wanted Mr. Tyrer to call him back as it was very important. I think there were two calls for Mr. Tyrer that morning, one of which was from Mr. Allison, so I called Mr. Tyrer at his home and gave them to him. I told him Mr. Allison was very anxious to get hold of him. Q. Then what happened? A. Well, at about nine o'clock Mr. Tyrer called me back and I told him that Mr. Allison was still calling and awfully anxious to get in touch with him, and that he said it was very important. Mr. Tyrer said he was in a great hurry, but that he would call Mr. Allison right away. With-

in a few minutes after that Mr. Allison called again. This time he said that Mr. Tyrer had phoned him and said it would be all right for me to read him the prices on the Naval Depot specifications, which I did. Q. Handing you Plaintiff's Exhibit "3," I will ask you if that is a copy, or might it be a copy, of the paper which you read to Mr. Allison? A. Yes, it is. Q. Do you recall anything as to what Mr. Allison's reactions were while you were reading to him over the phone? A. I started to read the letter and I got —I don't know just how far I got into the letter—and he interrupted me and asked for further figures, and when I read them to him he said at that time he was satisfied, but I made him hang onto the telephone until I read the whole letter to him. Q. Are you sure you read the whole letter to him? A. I know that I read it all to him. Q. Even the item of soil stabilization? A. Yes, every bit of it. Q. And you say that during that time he was anxious to get off the telephone? A. Yes, he was."

On cross-examination, Mrs. Byers testified:

"Q. And, finally, you got the whole thing read to him? A. Yes, I did. He had the whole letter word for word."

Appellant prepared and submitted his bid, a copy of which was introduced in evidence. This document reads in part as follows:

"BASE BID: For all work shown on drawings and/or described in the specifications with the exception of items listed as Alternates, the sum of
ONE MILLION, NINE HUNDRED NINETY-SIX THOUSAND DOLLARS
........................................................................................ DOLLARS ($1,996,000.00)."

Upon the opening of the bids, it was ascertained that appellant was the lowest bidder. Mr. Tyrer, who was waiting outside of the room in which the bids were opened, met appellant as he left the room. Concerning the conversation which then took place between them, Mr. Tyrer testified:

"A. Well, I waited outside the bidding place, as only one member was allowed in at a time, and later I heard that Valle was low. When he came out he recognized me and told me that he had used our prices. He called me by my first name. He said, 'Tom, we used your prices and figures. Of course they have not awarded me the job yet, because first of all they will have to weigh me. But I don't think there is any doubt about my getting it.' In other words, he

meant that they would have to check to see whether he was capable of doing the job, but he said that he was sure the job would be awarded to him. He said that he had used our prices but the job had not been awarded to him and therefore he could not award us the asphalt part and for me to see Mr. Allison on Monday. He said, 'You see Allison on Monday and he will take care of you. I have bought a place on San Juan Island and am going to skip out for awhile.' "

In due time, the contract for the construction was awarded to appellant.

It appears that respondent's estimate for the total cost of the work which respondent desired to perform under the contract and for which amount respondent would agree to do the work, was $294,539.51, which total comprised $246,610.90 for asphaltic concrete and $47,928.61 for soil stabilization.

During the course of conversations between Messrs. Allison and Valle on the one hand and Mr. Tyrer on the other between July 28th and August 8th, the latter was told that, in preparing appellant's bid, Mr. Allison had made an error and had taken into consideration only the amount which respondent had estimated for asphalt installation and had omitted the item of approximately $48,000 estimated for soil stabilization, and that consequently some adjustment would have to be made before the subcontract for doing the work could be awarded to respondent, appellant requesting that respondent make a consolidated bid.

The parties failed to reach any agreement, and no subcontract was awarded to respondent, whereupon this action was instituted.

Three of respondent's officers testified that, in their opinion, the reasonable value of the services rendered by respondent to appellant in furnishing Mr. Allison the information above referred to was $43,000, which amount they arrived at by estimating the profit which respondent would have made had it been awarded the subcontract for the work in question.

Respondent does not contend that, during the telephone conversations of July 28th between Mr. Allison on the one hand and Mr. Tyrer and Mrs. Byers on the other, anything was said to the effect that appellant was expected to pay for the furnishing of the estimates, figures, and prices which were then made available to Mr. Allison, respondent anticipating that it would be compensated by receiving a subcontract if the general contract was awarded to appellant.

Respondent's officers testified that they expected compensation either by being awarded the subcontract or otherwise, and that other contractors who had received the same information given to Mr. Allison had not been charged therefor because their bids upon the general contract had not been accepted.

Appellant's motion for dismissal of the case interposed at the close of respondent's evidence having been denied, appellant introduced its evidence.

Appellant's witness Allison testified that the prices and estimates read to him over the telephone by Mrs. Byers were written down by the witness, the writing having been introduced in evidence. Mr. Allison also testified that he used these figures in making appellant's bid on the whole contract, but that by error he omitted the estimated cost of soil stabilization which respondent had estimated at approximately $48,000, and that, by reason of this omission, appellant estimated the cost of laying asphaltic concrete and soil stabilization at approximately $246,000, instead of at approximately $294,000.

Testimony was also introduced to the effect that, if the correct figure had been employed, appellant would not have been the lowest bidder on the general contract, and that the contract would not have been awarded to appellant.

It also appears from appellant's testimony that the contract was never completed, but that it was terminated for the convenience of the government after considerable work had been performed thereon, and that the financial adjustment made by the government was fair to him. Appellant also introduced evidence to the effect that neither Mr. Alli-

son nor appellant ever expected or intended to compensate respondent for furnishing the figures given to Mr. Allison; that it was not customary to pay for such estimates; and that appellant never had paid for such a service. Several contractors testified that, under the circumstances shown, they had not charged for furnishing prices and estimates under similar circumstances.

At the close of the evidence, appellant again demurred to the evidence and moved for a directed verdict on the ground that there was no evidence before the court which would support a verdict in respondent's favor.

It appears from the evidence that appellant was most anxious to procure figures and estimates upon the two phases of the general contract in connection with which respondent had prepared figures. This fact, of course, of itself does not establish any liability on the part of appellant to pay for the service rendered in furnishing appellant with the estimates.

Respondent's theory is apparently that it is entitled to recover upon the basis that the jury might have found that appellant was liable to respondent as upon a contract implied in fact.

The first question to be determined is whether or not the record contains evidence which would support a verdict in favor of respondent. The trial court submitted the matter to the jury, which returned a verdict in favor of appellant; but the court having granted a new trial, appellant on appeal may contend that the evidence introduced on respondent's behalf was insufficient as matter of law to warrant submission of the case to the jury.

Appellant relies upon the case of *Chandler v. Washington Toll Bridge Authority*, 17 Wn. (2d) 591, 137 P. (2d) 97. The facts in the case cited differ so greatly from the facts contained in the record before us that the case is not here in point. In the *Chandler* case, the plaintiff, seeking to hold the defendants liable to him, relied largely upon the doctrine of unjust enrichment; while, in the case at bar, respondent contends that it should recover upon a contract implied in fact.

■ The law governing the situation before us is comprehensively stated in 71 C. J., Work and Labor, pp. 39, 40, 41, 42, 44, 45. The following sections of the text are pertinent to this inquiry:

"[§ 3] C. CONFERMENT OF BENEFIT—1. AS GROUND FOR IMPLICATION OF CONTRACT. While the rendition of valuable services by one to another, who knowingly receives the benefit of them, is evidence of a mutual understanding that they are to be paid for, it does not follow from this principle that the establishment of these facts will in every case sustain a finding that the recipient of the services promised to pay for them, and the single fact that one received benefit from services, work and labor, or incidental materials is not sufficient of itself to create a legal obligation to pay therefor.

"[§ 4] 2. AS ESSENTIAL ELEMENT OF LIABILITY. In the absence of a request, benefit to the recipient is an essential element of his implied obligation to pay for work or materials, although it is not essential to recovery that services rendered have any specific value. In the case of work performed at the recipient's request no benefit to the obligor is necessary, and compensation for services performed at the request and on the credit of defendant may be recovered of him, although they are for another's benefit."

"[§ 6] E. EXPECTATION OF PAYMENT.—1. NECESSITY FOR IN GENERAL. To recover for work and labor on the theory of an implied contract it is ordinarily deemed essential to show that the services were rendered under the reasonable expectation that they would be paid for, by the person sought to be charged, and that the person sought to be charged knew that the services were being performed with the expectation that he would pay for the same, and the law will not imply a promise to pay for services contrary to the intention of the parties, as where it is obvious that there was no intent on the part of either party that payment should be made, *although, if the recipient of services should, as a reasonable man, have understood that the performer expected compensation, the actual belief of the recipient as to such matter is immaterial,* and it has been held that a contract may be implied in law to pay for services performed without intent of the performer to make a charge therefor, at least where the recipient of the services expected to pay for the same. The question as to whether or not services were to be rendered gratuitously resolves itself

into one of the intention of the parties, which intention may be inferred from the surrounding circumstances. A presumption that payment was contemplated arises where the labor rendered was of a kind ordinarily the subject of remuneration, and was rendered with the recipient's knowledge and consent, and where there was nothing in the relation of the parties to rebut such presumption. Where services of a beneficial character are performed by one for another with the latter's express or implied assent, or upon his request, a promise to pay will be implied if the circumstances were such as to negative the idea of gratuity and to raise a presumption that compensation was expected." (Italics ours.)

"[§ 9] F. ACCEPTANCE OF, OR ASSENT TO, SERVICES—1. IN GENERAL. Irrespective of a precedent request, where beneficial services or valuable materials have been rendered and accepted, the law will ordinarily imply a promise to pay their reasonable value, the intent to pay being found as a part of the agreement. In other words, the acceptance of valuable services and materials raises a presumption of intent to pay, or that the services were to be compensated, or a presumption of legal liability, and, while such presumption is not conclusive, it is sufficient to throw upon the person contesting liability, the burden of showing an agreement or other circumstances indicating that the services were to be gratuitous."

The foregoing statements are supported by 1 Williston on Contracts (rev. ed.) 93 to 98, §§ 36, 36A; 3 Page on the Law of Contracts (2d ed.) 2466, 2470, 2472, §§ 1442, 1444, 1445, 1446; 6 R. C. L. 587, 588, Contracts, § 6.

Appellant relies upon the case of *Equitable Life Ins. Co. of Iowa v. Crosley*, 221 Iowa 1129, 265 N. W. 137. In the case cited, it appeared that the plaintiff sought foreclosure of certain mortgages against the property of the defendant, who counterclaimed for services rendered. The trial court allowed recovery on certain counterclaims, and, on appeal to the supreme court, the decree was reversed with instructions to disallow certain of these claims. It should be noted, however, that the supreme court stated that the defendant had made a *prima facie* case by his evidence. As to certain of the claims, the supreme court held that the trial court had erred in allowing the same, but the court reversed a

judgment of the trial court and not a verdict of the jury, holding that the *prima facie* case made by the defendant had been rebutted by the evidence introduced by the plaintiff in opposition to the defendant's counterclaims.

The case of *City Ice & Fuel Co. v. Bright*, 73 F. (2d) 461, decided by the circuit court of appeals for the sixth circuit, while not exactly in point on the facts, is of interest. The plaintiff, Bright, sought compensation for information and data furnished the defendant (appellant before the circuit court). One count in the complaint was based upon *quantum meruit*. The jury in the district court returned a verdict for the plaintiff, from which the appeal was taken, the appellant contending that there was no evidence to sustain the verdict. The circuit court held that there was ample evidence "from which the jury might conclude that appellant was making full use of the information furnished by appellee."

From the opinion, it appears that the appellant understood that Bright expected compensation if appellant should acquire the properties upon which Bright had reported; and the court held that:

"The absence of an express agreement does not preclude the jury from considering under the common counts the value of the data which appellant unquestionably sought and used."

The court quoted from the opinion of the supreme judicial court of Massachusetts written by Chief Justice Holmes in the case of *Spencer v. Spencer*, 181 Mass. 471, 63 N. E. 947.

In the Massachusetts case, it appeared that a sister sued her brother for services rendered as a housekeeper. From a judgment in favor of the defendant, plaintiff brought exceptions, which were sustained. The opinion states that the trial court had

". . . instructed the jury in substance that the plaintiff could not recover unless she had expected to be paid for her services and had believed that the defendant knew that payment was expected for them, and unless the defendant had expected to pay for them and had believed

that the plaintiff expected to have pay for them. The plaintiff excepted, and brings the case here after a verdict for the defendant."

The opinion continues:

"We have felt some doubt whether these instructions should be construed to mean anything more than that the parties must have understood that they were dealing on a business footing, in which case we should hesitate to sustain the exceptions merely because of a theoretical leak to which no attention was called. Even so construed the proposition would be inaccurate since it would be enough to make a contract if the defendant as a reasonable man ought to have understood that the services were rendered for pay and not merely for love. But we are of opinion that the language of the judge went further than we have suggested, and too far for us to save it, however proper the verdict may seem to have been. Of course it does not matter whether the defendant expected to pay for the services or not, the question is as to the natural import of his overt acts. *Bohn Manuf. Co. v. Sawyer,* 169 Mass. 477 [48 N. E. 620]. *Hobbs v. Massasoit Whip Co.,* 158 Mass. 194, 197 [33 N. E. 495]. *Again, it is not necessary that the defendant should have believed that the plaintiff expected pay. If as a reasonable man he should have understood from what he knew that such was the expectation, he would be bound by accepting the services.* Day v. Caton, 119 Mass. 513 [20 Am. Rep. 347]. It is unnecessary to criticise the ruling further. [Italics ours.]

*"Exceptions sustained."*

The language of Judge Holmes in the case last cited has been approved by standard text writers and in simple language states a sound rule of law.

The fact that respondent hoped to obtain a subcontract from the general contractor to whom the work might be awarded, and that with this idea in mind, respondent made available to appellant its figures and computations concerning that portion of the general contract in which respondent was interested, is not necessarily inconsistent with its expectation that it would be entitled to receive reasonable compensation for the service rendered if appellant was awarded the construction contract and did not

award respondent the subcontract which respondent desired. We are not in accord with the view that such services rendered in connection with a contemplated contract and with the hope of obtaining a benefit from such contract are necessarily not so rendered in expectation of compensation. In the case at bar, the evidence on this phase of the case presents a question to be determined by the trier of the facts.

 The trial court did not err in overruling appellant's motion, made at the close of all the evidence, to dismiss respondent's action. The evidence presented a case that should be determined by the trier of the facts—in this instance the jury.

As above stated, the trial court granted respondent's motion for a new trial upon two grounds: first, that the court had erred in giving the jury an instruction to which respondent had excepted; and, second, "That the verdict is contrary to the evidence adduced at the trial and substantial justice has not been done."

 The second ground upon which the trial court granted a new trial was a matter resting, as stated by this court in the case of *Bond v. Ovens,* 20 Wn. (2d) 354, 147 P. (2d) 514, within

" . . . the inherent power of a trial court, of general common-law jurisdiction, to set a verdict aside, if satisfied that substantial justice has not been done."

In the case last cited, the order granting a new trial was in effect in the same language above quoted from the order granting a new trial in the case at bar.

The case of *Bond v. Oven, supra,* was approved and followed by this court in the recent case of *Yocum v. Department of Labor & Industries,* 22 Wn. (2d) 72, 154 P. (2d) 306.

Since the order granting a new trial must be affirmed, it is not necessary to consider the first ground upon which the trial court granted that motion, namely, that the court had erred in giving an instruction to which respondent took an exception. It may be noted, however, that instruction No. 10, to which respondent did not except, contains lan-

guage very similar to that in instruction No. 11, to which respondent excepted.

The order appealed from is affirmed.

BLAKE, ROBINSON, and JEFFERS, JJ., concur.

---

September 8, 1946. Petition for rehearing denied.

