[No. 30015. Department One. April 3, 1947.]

ROBERT L. KELLOGG, *Respondent,* v. FRANK G. GLEESON, *Appellant.*[1]

[1]Reported in 178 P. (2d) 969.

502

*John F. McCarthy* and *W. R. Studley*, for appellant.

ABEL, J.—Defendant was a doctor occupying offices in the Peasley Building, Longview, Washington, under a month-to-month tenancy. Being dissatisfied with his offices, in the fall of 1942 he entered into negotiations with the manager of the building for more desirable space. The manager agreed to make some improvements, and bids were called for from two contractors, one of them being plaintiff. The bids submitted were too high, and both were rejected.

On December 1, 1942, another suite of offices became vacant in the Peasley Building, and plaintiff was again called in. After discussing the matter with defendant and the manager of the building, plaintiff estimated that he could do the work for the sum of five hundred dollars. No formal plans or specifications were prepared, and no written contract was entered into. Plaintiff was not around very much during the progress of the work, but he or his employees did the type and amount of work as requested from time to time by defendant. He testified that he had several discussions with defendant during the progress of the work, in which he stated that the amount of work being done was going over the estimate of five hundred dollars. Defendant never indicated to plaintiff that he would pay or be responsible in any manner for any of the work. When plaintiff was asked if he had any authority from the manager of the building or *anybody* to go over five hundred dollars, his answer was no. Shortly thereafter, plaintiff testified as follows:

"Q. Did you tell him (defendant) he was going to have to pay if this job ran over? A. I don't believe I did. Q. He didn't tell you he was going to pay anything? A. It was just assumed he would pay if he ordered above that cost. That was the agreement, we were to keep to this cost. Q. In that original agreement, he didn't agree to anything, did he? That is, the whole contract was to be paid by the owners of the Peasley Building, isn't that right? A. To the extent of $500.00. Q. That was the only agreement made by Mr. Davis that they would pay $500.00 for this work, is that correct? A. That's correct. Q. Dr. Gleeson never at any time agreed to pay you anything, did he? A. Well, we discussed these extras, and— Q. (interposing) I know, but he never said, 'I will pay you,' did he? The Court: What were you going to say? A. When we discussed the overage on the cost and he realized they were going over $500.00, it was naturally assumed he was going to pay them."

The manager of the building testified as follows:

"Q. Then you are sure that the place was to be fixed up to Dr. Gleeson's satisfaction and he (plaintiff) was to do it for $500.00, is that right? A. That's right."

Plaintiff testified that all of the different items of work were estimates. He later testified that the manager of the building told him at one time

". . . if it did run $750.00, he was sure the Peasley building would have no objection. It wasn't set at any definite amount of $500.00. This agreement was not definitely set."

After the work was completed, plaintiff endeavored to collect the entire bill from the manager of the building. However, when he refused to pay more than five hundred dollars, then plaintiff brought this suit against defendant for the balance of his repair bill.

The trial judge made a memorandum opinion, in which he stated as follows:

"I know of no method or way of solving this question other than weighing the probabilities or improbabilities of a contractor entering into such an agreement. To say the preponderance of the probabilities are upon the affirmative side of the question is to say that a contractor would agree to make an improvement for $500.00 or any nominal sum that

might run into several thousand dollars. On the other hand, I think it more reasonable to suppose that the contractor would limit the cost price of the labor and material within his bid or somewhere within reason. I think human conduct and experience justifies a conclusion that Kellogg did limit himself to the making of the improvements listed in Exhibit No. 1."

 There being no express contract between the parties, the question for us to determine is whether or not there was an implied contract. The general rule as applied to implied contracts is set forth in 17 C. J. S. 318, 319, 320, as follows:

"An implied contract must depend on substance for its existence, and it cannot arise from nothing, such as a conjecture or a possibility; in other words, there must be some act or conduct of the party sought to be bound, from which an implied contract arises, the implication arising only from something which the party sought to be bound says or does. They are created by circumstances. . . .

"The implication, of course, must be a reasonable deduction from all the circumstances and relations of the parties, such as was within the contemplation of the parties when making the contract, or else necessary to carry their intention into effect, although it need not be evidenced by any precise words, and may result from random statements and uncertain language."

The case of *Troyer v. Fox*, 162 Wash. 537, 298 Pac. 733, 77 A. L. R. 1132, was a case where plaintiff brought an action to recover the value of his interest in certain patent rights which he owned jointly with a corporation, and which he and the corporation had transferred to a third party. The action was brought against two of the stockholders of the first-mentioned corporation. The trial court found in favor of plaintiff on the theory of an implied contract, but this court reversed the decision on the ground that it appeared from the evidence that there was no express agreement between the parties, and that it further appeared that, at the time the transaction took place, the plaintiff was looking to the corporation and not to the individual stockholders for payment. We stated, on p. 554:

"Thus, the respondent admits that, from the statements made in the office of the counsel for the Seattle-Astoria Iron

Works, he got the impression that the iron works would pay his share, and not that the appellants, two of its stockholders, would do it.

"To further review the testimony would unreasonably extend this opinion. It matters not whether the claimed agreement be considered as an express or implied contract. The result will be the same. An implied contract differs not from an express contract, except in the mode of proof. Both grow out of the intentions of the parties to the transaction, and *there must be a meeting of minds* whether the contract be express or implied.

" 'A true implied contract is an agreement of the parties arrived at from their acts and conduct viewed in the light of surrounding circumstances, and not from their words either spoken or written. Like an express contract, it grows out of the intentions of the parties to the transaction, and there must be a meeting of minds. Such a contract differs from an express contract only in the mode of proof.' *Western Oil Refining Co. v. Underwood,* 83 Ind. App. 488, 149 N. E. 85."

See, also, *McKevitt v. Golden Age Breweries,* 14 Wn. (2d) 50, 126 P. (2d) 1077.

■ The burden of proving an express or implied contract is on the party asserting it, and he must prove each fact essential thereto, including the existence of a mutual intention. Where circumstantial evidence is relied on, the circumstances must be such as to make it reasonably certain that the parties intended to and did enter into the alleged contracts.

■ One of the essential elements in the establishment of an implied contract in a case such as this, where recovery is sought for the value of work or materials furnished, is that it must appear that the services were rendered or the materials furnished under such circumstances as to indicate that the person furnishing the same expected that he would be paid therefor by the party sought to be charged, and that the latter expected or should have expected to pay for the same. 71 C. J. 41, § 6:

"To recover for work and labor on the theory of an implied contract it is ordinarily deemed essential to show that the services were rendered under the reasonable expectation that they would be paid for, by the person sought to be

charged, and that the person sought to be charged knew that the services were being performed with the expectation that he would pay for the same, and the law will not imply a promise to pay for services contrary to the intention of the parties, as where it is obvious that there was no intent on the part of either party that payment should be made, although, if the recipient of services should, as a reasonable man, have understood that the performer expected compensation, the actual belief of the recipient as to such matter is immaterial."

In the case at bar, the facts show that respondent apparently assumed that, if he did the work, somebody would pay him. He did not have any clear opinion as to who was responsible for his bill. It is likewise very clear that appellant never at any time had any idea that he would be expected to pay any part of the bill. The circumstances were such that any reasonable man placed in appellant's position would not have expected that he would be required to make any such payment.

We do not agree with trial court that appellant should be required to pay merely because of the improbability that a contractor would make these improvements without knowing from whom he was going to get his pay. The contractor had no right to assume that a month-to-month tenant would pay for substantial improvements to a building under such circumstances as existed in this case. We feel that the evidence clearly indicates a very careless method of doing business on the part of the contractor. He knew that the tenant was trying to get suitable offices; he had made a previous bid for these improvements. He knew that appellant was trying to get the manager of the building to make these improvements for him. The contractor was employed by the manager of the building, and he should not collect his repair bill from a tenant on the evidence he presented.

Judgment is reversed, with directions that the cause be dismissed.

MALLERY, C. J., MILLARD, SIMPSON, and SCHWELLENBACH, JJ., concur.