[No. 37320.   En Banc.   September 23, 1965.]

JAMES JACOBS *et al., Appellants,* v. ELIZABETH A. BROCK, *as Executrix, Respondent.**

*Reported in 406 P.2d 17.

*Greenwood, Shiers & Kruse*, by *Leonard W. Kruse*, for appellants.

*Conniff, Harper & Taylor*, for respondent.

HUNTER, J.—This is an action on a claim against the estate of a decedent for the reasonable value of services rendered and expenses paid in his behalf during the last 3 years of his life. Plaintiffs (appellants) are James and Beatrice Jacobs, husband and wife. The defendant (respondent) is Elizabeth A. Brock, executrix of the estate of the decedent, Dr. Harry M. Brock, who was a retired Port Angeles dentist.

Mrs. Jacobs' acquaintanceship with Dr. Brock dates back to the depression year of the '30s, when her parents, the Rands, rented a house from him. The tenancy lasted 7 to 8 years, and the Rands paid a monthly rental of $12.50 in services, as follows: Mrs. Rand did the family washing for Dr. and Mrs. Brock, including the washing for Dr. Brock's dental office, which he operated in his home; her sons gathered wood for the Brocks' furnace, and Mrs. Jacobs, then a schoolgirl, kept house for the Brocks. The Rands moved during the late '30s, and for the next 20 years Mrs. Jacobs saw little of the Brocks. She made several visits to the Brock home and stopped to give Dr. Brock a ride whenever she saw him walking home from down-

town Port Angeles. Mrs. Brock died in the early '40s, and thereafter, Dr. Brock lived alone.

In November, 1958, during one of Mrs. Jacobs' infrequent visits, she found Dr. Brock recovering from pneumonia and quite ill. Thereafter, and until his death February 7, 1962, she cared for him an average of 4 hours a day. In those 3 years Dr. Brock was racked with illness. He was unable to control his bladder, and in late 1960 he suffered a stroke. In the last year of his life he suffered from diarrhea, and a month before his death he underwent a urinary operation, following which he was bedridden. Mrs. Jacobs provided Dr. Brock intensive care during this month-long period. Among her duties, she was required to give him daily enemas.

Mrs. Jacobs served as Dr. Brock's nurse, housekeeper, and, occasionally, his provider during the 3 years. She did his washing in her own home, a task both monumental and unpleasant considering his elimination difficulties. (He wore diaper-type pads which required frequent changing.) She on occasion purchased food and other items for him with her own funds, prepared his meals, canned food for him, started the furnace, cared for his six cats, kept house, took him on various automobile excursions, shaved him and trimmed his toenails. Dr. Brock requested services by telephone, as often as twice a day.

At Dr. Brock's request, Mr. Jacobs expended a minimum of 26 hours in performance of odd jobs for decedent during the 3 years preceding decedent's death. These tasks included furnace, electrical and plumbing repairs, and cutting and hauling of wood at Dr. Brock's nearby Lake Crescent cabin.

The only gratuity Dr. Brock bestowed upon the Jacobs was the use of his lake cabin. Most of the furnishings in the cabin belonged to the Jacobs, but they rarely used the cabin for their own purposes. Mrs. Jacobs took decedent there frequently. The Jacobs never used the cabin more than a week at a time, and even on those occasions, Mrs. Jacobs remained in town to care for decedent.

The Jacobs never submitted a bill for services to Dr. Brock, but Mrs. Jacobs did expect compensation. She testified that she and decedent had a mutual understanding that the lake cabin was to be hers in return for the services. However, by terms of decedent's will, executed in 1956, the lake cabin and the bulk of the estate went to a great, great niece, Harlene Brock. This eventuality precipitated this suit.

The plaintiffs alleged four claims in their complaint: (1) For specific performance of an express or implied contract in which decedent had promised to either make an inter vivos conveyance of his lake cabin to plaintiffs or devise it to them, in return for their services; (2), or, in the alternative, for $11,540.53, the reasonable value of services rendered and expenses paid by plaintiffs in decedent's behalf, and at his request, during the 3 years preceding his death (for which a claim had been filed in the estate, and rejected); (3) that defendant executrix be ordered to produce and carry out a will memorandum which Mrs. Jacobs alleged had devised to her the lake cabin; and (4) for the return of plaintiffs' personalty at the lake cabin.

At the close of plaintiffs' evidence the trial court granted defendant's motion to dismiss, as to claims one through three. Defendant conceded the validity of the fourth claim and returned the lake cabin personalty to plaintiffs. Plaintiffs conceded a failure of proof on their first claim, for specific performance, and consented to its dismissal. Plaintiffs did not assign error to dismissal of their third claim. The will did incorporate a memorandum by reference, but the memorandum was never found.

Plaintiffs contend that the trial court erred in dismissing claim number two, for reasonable value of services rendered and expenses paid in decedent's behalf. It therefore becomes the sole claim before us on plaintiffs' appeal from the dismissal. Plaintiffs urge that an implied contract in fact existed for payment of such services and expenses. It is plaintiffs' contention that their evidence proves such a contract.

■ In granting a dismissal at the close of a plaintiff's evidence, as in this case, the trial court is not required to consider the evidence most favorable to the nonmoving party, as in a jury case. The trial judge, as a trier of the facts, may or may not weigh the evidence. Before considering the testimony introduced we must then determine what the trial court did in this instance. In *Richards v. Kuppinger*, 46 Wn.2d 62, 278 P.2d 395 (1955), we laid down the rule for making this determination:

> In determining whether the trial court has weighed the evidence or has treated plaintiff's evidence as true, and has given him the benefit of the most favorable inferences to be drawn therefrom, this court looks first to the trial court's oral or memorandum opinion. *O'Brien v. Schultz*, 45 Wn. (2d) 769, 278 P. (2d) 322, *Grichuhin v. Grichuhin*, 44 Wn. (2d) 914, 272 P. (2d) 141. If the trial court's opinion discloses that it treated plaintiff's evidence as true and held, *as a matter of law*, that plaintiff has not established a *prima facie* case, findings of fact are unnecessary. *In such case, our review of the evidence is limited to determining whether there is sufficient evidence or reasonable inference from the evidence to establish a prima facie case for plaintiff.* (Italics ours.)

In examining the trial court's oral opinion we find nothing that indicates the testimony of the witnesses was disbelieved, or that the trial court weighed the evidence. To the contrary, it appears the motion for dismissal was granted on the ground that treating the plaintiffs' evidence as true it was insufficient to establish a prima facie case. We thus may review the record to determine whether there is sufficient evidence or reasonable inferences therefrom to establish a prima facie case for plaintiffs. *Richards v. Kuppinger, supra.*

■ The trial court entered limited findings in its order of dismissal and concluded from the record that a reciprocal course of conduct of kindness and favors was extended between the decedent and the plaintiffs for many years and that the decedent, therefore, was not incurring a financial obligation by accepting the plaintiffs' services. If such

a reciprocal course of conduct is supported in the record, then plaintiffs will be unable to prove an implied contract in fact. See *Johnson v. Nasi*, 50 Wn.2d 87, 309 P.2d 380 (1957); *Johnson v. Suddreth's Estate*, 59 Wn.2d 517, 368 P.2d 907 (1962).

It is the plaintiffs' contention that the record does not support reciprocal conduct and that no services were furnished by the decedent to the plaintiffs which were of any substance in this case. We agree. We have heretofore detailed the facts as to the favors extended by the decedent. The only evidence showing a benefit running from the decedent to the plaintiffs was that the decedent had afforded the plaintiffs the use of his lake cabin, which was rarely visited by them. The defendant's answer affirmatively alleges reciprocal conduct on the part of the decedent, but there is no evidence in the record to support the allegation. The furnishing of the house to Mrs. Jacobs' parents in the '30s for a monthly rental of $12.50 was paid through the rendering of household services to the Brocks. Even if considered in the nature of a gratuity extended to the Rands, such did not run to the Jacobs. Thus, the trial court erred in concluding from the record that reciprocal benefits existed. The benefits flowed in one direction—from plaintiffs to decedent.

Having concluded that there were no reciprocal benefits, the issue remaining for our determination is whether the record will support plaintiffs' contention that an implied contract in fact existed to pay the reasonable value of plaintiffs' services and expenses. The guidelines for making this determination are well established in this state:

In *Johnson v. Suddreth's Estate, supra*, we stated:

The rule governing the disposition of this appeal is succinctly set forth in *Johnson v. Nasi*, 50 Wn. (2d) 87, 91, 309 P. (2d) 380 (1957):

"A party seeking to establish a claim against an estate for services rendered to the decedent during his or her lifetime has the burden of proving a contract, express or implied, to pay for the services; and the evidence to support such claim must be clear, cogent, and convincing.

*Ross v. Raymer, supra* [32 Wn. (2d) 128, 201 P. (2d) 129 (1948)].

"An implied contract is an agreement depending for its existence on some act or conduct of the party sought to be charged and arising by implication from circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other. The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and *that the recipient expected, or should have expected to pay for them.*" (Italics ours.)

This court has adopted the following rule, as stated in 71 C.J., Work and Labor § 6, 41, 42 (98 C.J.S. *Work and Labor* § 8):

if the recipient of services should, as a reasonable man, have understood that the performer expected compensation, *the actual belief of the recipient as to such matter is immaterial.* (Italics ours.) *Kellogg v. Gleeson,* 27 Wn. (2d) 501, 178 P. (2d) 969 (1947); *Ross v. Raymer, supra; Western Asphalt Co. v. Valle,* 25 Wn. (2d) 428, 171 P. (2d) 159 (1946).

In *Western Asphalt* we quoted with approval the following language of Chief Justice Holmes in *Spencer v. Spencer,* 181 Mass. 471, 63 N.E. 947 (1902):

"Of course it does not matter whether the defendant expected to pay for the services or not, the question is as to the natural import of his overt acts. . . . *Again, it is not necessary that the defendant should have believed that the plaintiff expected pay. If as a reasonable man he should have understood from what he knew that such was the expectation, he would be bound by accepting the services.* . . . [Italics ours.]"

In *Hardung v. Green,* 40 Wn.2d 595, 244 P.2d 1163 (1952), we stated:

where there is a lack of mutuality in the benefits received, a promise to pay will be implied. *Allerton v. Allerton,* 133 Wash. 260, 266, 233 Pac. 632 (1925).

In *Suddreth, supra,* quoting from *Hardung v. Green, supra,* we stated:

"The general rule seems to be that, in the absence of circumstances indicating otherwise, it is inferred that a

person who requests another to perform services of value for him thereby bargains and by implication agrees to pay for such services. Restatement, Restitution, § 107 (2); *Cramer v. Clark*, 121 Wash. 507, 209 Pac. 688, 24 A.L.R. 970."

In the instant case, there was a lack of mutuality of benefits. A promise to pay was therefore implied. *Hardung v. Green, supra.* The evidence in the record further shows that the services were requested, which also raised a promise to pay. *Johnson v. Suddreth's Estate, supra.*

In *Suddreth*, under similar facts, plaintiff proved an implied contract in fact existed to pay reasonable value of services. To substantiate the existence of mutual assent, we said:

> The duties Mrs. Johnson performed during decedent's terminal illness were beyond the scope of neighborly concern and helpfulness.

The degree of services Mrs. Jacobs performed, considering the unpleasant nature involved, far outweighs those plaintiff performed in the *Suddreth* case. The statement in *Suddreth* that such services were beyond the scope of neighborly concern and helpfulness thus applies even more in the case at bar in establishing mutual assent. The evidence shows that plaintiff wife expected compensation for her services, and in view of the circumstances, decedent, as a reasonable man, should have viewed her conduct as an offer and by accepting her services should have expected to pay. *Johnson v. Suddreth's Estate, Kellogg v. Gleeson, Ross v. Raymer, Western Asphalt Co. v. Valle, Spencer v. Spencer, supra.* See Shattuck, Contracts in Washington, 1937-1957, 34 Wash. L. Rev. 24, 28 (1959).

Under the facts of this case, it seems plain that the requirements for an implied contract in fact were established by clear, cogent and convincing evidence.

The defendant argues that the fact that no demand for payment for such services and expenses was made during the decedent's lifetime is fatal to plaintiffs' claim. This argument is answered in the record. There was no reason for the plaintiffs to request payment for their services and

expenses during the decedent's lifetime, in view of Mrs. Jacobs' understanding with decedent that compensation was to be the lake property. Mrs. Jacobs testified on direct examination, without objection:

> Q. Mrs. Jacobs, in rendering the services you did to Dr. Brock, I will ask you whether or not you did them with the expectation of being paid for them? . . . A. Yes, I did expect pay, in respect to the place at the lake. . . . Q. Why didn't you give him [Dr. Brock] any statement or billing? A. Our understanding was the place at the lake was to be mine.

Under such circumstances, where a contract for payment of the reasonable value of services may be implied, recovery for compensation may be had in an action at law where no provision is made for the expected legacy. The rule is correctly stated in 57 Am. Jur. § 179:

> If services are rendered to a person at his request, made under such circumstances that a promise to compensate therefor may be implied, he is liable therefor, *even though they were renderd in expectation of a legacy.* (Italics ours.)

This statement is supported by *In re Murphy's Estate,* 110 Colo. 304, 134 P.2d 199 (1943); *Thompson v. Stevens,* 71 Pa. 161, 169 (1872). See *Giering v. Sauer,* 120 Md. 295, 87 Atl. 774 (1913). Also see 34 C.J.S. *Executors and Administrators* § 370f, cited in *Johnson v. Nasi, supra;* Annot., 54 A.L.R. 548.

Therefore, on the evidence in the record, plaintiffs made out a prima facie case, and the trial court erred in granting the motion to dismiss their claim for reasonable value of services and expenses. The cause should be remanded for a new trial on this issue.

■ Plaintiffs contend that the trial court erred in striking the testimony of one Juanita Jacobs (not related to plaintiffs), on the ground that she was not qualified as an expert witness. We agree. The trial court manifestly abused its discretion. The witness had operated nursing homes for more than 10 years and was well acquainted with the reasonable value of the nursing care tendered the dece-

dent by the plaintiff wife. She was therefore qualified to testify as an expert witness in regard to such services.

In view of the remand, our consideration of the remaining issues raised is unnecessary.

The judgment of the trial court is reversed as to claim number two, and the cause is remanded for a new trial thereon. The judgment is otherwise affirmed.

FINLEY, WEAVER, HAMILTON and HALE, JJ., concur.

DONWORTH, J. (dissenting)—I disagree with the majority opinion in several respects. First, in its order of dismissal, the trial court included the following findings of fact:

After argument of counsel, and due consideration, the Court finds that the files and the evidence presented shows the following factual situation:

I. The decedent left a last will and testament duly executed on the 12th day of April, 1956, by which he left all of his property to Harlene Brock, his great, great niece, and that this will had not been revoked at the time of his death on February 7th, 1962, although he was mentally alert until his death.

II. That plaintiffs and decedent had been very close friends for many years prior to his death and that each had provided the other with many substantial services and kindnesses, for which no payments were made or expected.

III. That although during the latter part of decedent's life, plaintiffs provided him with services, nursing and otherwise, no evidence was presented, and it does not appear herein that anything occurred to change this reciprocal relationship between the parties or to indicate to decedent that he was incurring a financial obligation by accepting such service.

In its oral opinion, the trial court stated:

It is unfortunate these people who rendered these services were not in some way protected *if in fact they thought they were going to receive financial benefit from it*, but I don't see anything yet adduced by way of testimony to show that they were justified in so thinking, except the statement of some neighbor—I think there were two of them, a man and a woman—who came in here and said the decedent said he was going to give them

the lake property, or some such statement as that, and *that is the only testimony I can see in the case, and I don't believe it is enough to offset the fact of the law in these cases, nor the facts.* There was no time when Mr. Brock was unable—so far as the record shows, unless it was in the last week or so when he was actually in extremis—when these people couldn't have presented this to him and had an agreement with him and worked out a settlement. It went on from month to month and from year to year, and there is no testimony here so far as I can recall, and I am sure I am right about this, in which they ever demanded from him an accounting or payment on the accounting. They went to the lake together, they apparently enjoyed it, they had the key to the place, *there is some conflict about how much they used it, and it is not too much to say, and I am sure it was a fact, that until this case came up, they were fond of this old gentleman and took some degree of pleasure and satisfaction in doing for him.* He was a rather interesting man, I have talked to him, once, after his trip to Japan —in fact, I helped a little, I guess, in helping him to get a visa or passport. He seemed to be a man in possession of all his faculties and reasonably good condition as far as the activities were concerned, but at his age it was to be expected he would disintegrate, but these people stood by him all this time *and never made any effort to get a settlement with him or get a commitment on his part or otherwise. There is another aspect to this, too. While it isn't convincing, it is perhaps worth mentioning in passing.* If someone had come in and influenced this old gentleman in his last few years, a stranger to the claimant, or he was overreached in some such fashion as that, it would be something else, but the devisee in his will was the object of his natural bounty. (Italics mine.)

The italicized words show a balancing and weighing of evidence to determine how persuasive it was. The trial court was measuring appellants' evidence against the circumstances in the case. Appellants admit this, because in their assignments of error they challenge the findings of fact. Appellants were the plaintiffs below, and had the burden of proof. The trial court was simply testing their evidence to see if they had met the burden of proof.

When the trial court's findings are read in the light of its oral opinion, it is clear to me that the court weighed the plaintiffs' evidence and drew all favorable inferences therefrom. The court sustained defendant's challenge to the sufficiency thereof to make out a prima facie case in support of their second cause of action, which was based on the claim filed in Dr. Brock's estate for $11,540.53, which was alleged to be "the agreed and reasonable value" of the services rendered the decedent during the last 3 years of his life.

The majority, in remanding the case for a new trial, appears to me to be making its own finding of fact that there was no reciprocal benefit, but that all the benefits flowed in one direction—from plaintiffs to decedent. This is directly contrary to the trial court's findings of fact No. 2 and No. 3.

Assuming that the trial court accepted appellants' evidence as true, the test which should be applied to evidence as to a contract (express or implied) which will support a claim against an estate of a deceased party to the contract, is whether or not the evidence of the contract is proven by substantial evidence. The majority did not even apply the "substantial evidence" tests used in the *Richards* case (46 Wn.2d 62, 278, P.2d 395 (1955)), on which the majority appears to rely. In other words, the majority applied far too lenient a test when it overturned the findings of fact of the trial court. *Cf. In re Hansen's Estate, ante* p. 166, 169, 401 P.2d 866 (1965).

Second, the majority opinion relies on cases which do not support its position when applied to the facts of this case. Those cases have been misconstrued and are distinguishable on their facts.

*Johnson v. Suddreth's Estate*, 59 Wn.2d 517, 520, 368 P.2d 907 (1962), is the case most heavily relied on by the majority. The majority quotes the whole rule, but ignores the important part. The portion of the rule which should be emphasized is as follows:

"An implied contract is an agreement depending for its existence on some act or conduct of the party sought

to be charged *and arising by implication from circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other.* The services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and *that the recipient expected, or should have expected to pay for them."* (Italics ours.) (First italics mine.)

This same rule was paraphrased in the immediately preceding paragraph of the decision to show what part of the rule this court was emphasizing. We there stated:

An implied contract does not differ from an express contract except in the mode of manifesting assent. There must be evidence of the acts and conduct of the parties, *viewed in the light of surrounding circumstances, to justify the inference that promisee understood that promisor intended to make a promise and to support a conclusion that there was a meeting of the minds.* Restatement, Contracts § 5; *McKevitt v. Golden Age Breweries,* 14 Wn. (2d) 50, 52, 126 P. (2d) 1077 (1942), and cases cited. (Italics mine.)

It is the surrounding circumstances that determine whether an offer and acceptance of services implies a contract. The cases relied on by the majority all involve inference of a contract based on either an arms-length transaction, a prior history of business relationships, or a course of dealing in a commercial background.[1]

---

[1](a) Arms-length transactions:

*Kellogg v. Gleeson,* 27 Wn.2d 501, 178 P.2d 969 (1947); *Cramer v. Clark,* 121 Wash. 507, 209 Pac. 688, 24 A.L.R. 970 (1922); *Allerton v. Allerton,* 133 Wash. 260, 233 Pac. 632 (1925).

(b) Prior history of a business relationship:

*Johnson v. Suddreth's Estate, supra; Hardung v. Green,* 40 Wn.2d 595, 244 P.2d 1163 (1952).

(c) Course of dealing in a commercial background:

*Kellogg v. Gleeson, supra; Western Asphalt Co. v. Valle,* 25 Wn.2d 428, 171 P.2d 159 (1946).

Note that both *Ross v. Raymer,* 32 Wn.2d 128, 201 P.2d 129 (1948), and *Johnson v. Nasi,* 50 Wn.2d 87, 309 P.2d 380 (1957) are cases wherein the alleged contract claim was *denied.* The facts of those cases have striking similarity to the facts in the case at bar. Both the *Raymer* and *Nasi* cases were cited by the majority, but were *not* discussed.

The only case in which the majority compares the facts to those in the case at bar is *Johnson v. Suddreth's Estate, supra.* However, only the nature of the services is compared. But that case shows a prior history of a business relationship between the parties during the lifetime of the deceased party, and no history of close family friendship. This court in that case took special note of the facts. It stated:

> The record discloses: (a) Mrs. Johnson performed the duties of a practical nurse for a bedridden patient; (b) on several occasions, decedent telephoned Mrs. Johnson, as early as three-thirty in the morning, to come to her home; (c) decedent would write lists of duties, errands, and shopping to be done for her by Mrs. Johnson. A disinterested witness testified:
>
> "Q. . . . Mrs. Goldman, was Mrs. Suddreth the type of person who would pay for services she received? A. Yes, from years past she suggested or said always she wouldn't let anybody work for her for nothing."
>
> She further testified:
>
> "she never let anybody do anything for her that she didn't pay them."
>
> Although the admissibility of evidence of a transaction with a decedent was the principal question of law presented during trial, Mrs. Johnson testified without objection:
>
> "*Q. You indicated in your answer there that you had received prior compensation. A. Yes, sir. Q. Was it on the basis of that prior compensation that you believed that you might be compensated for this work that you did during this period of time? A. That's right.*" (Italics mine.)

Compare the foregoing testimony with the facts in the case at bar, where we have (1) a long history of family friendship, (2) a long history of gratuitous exchanges, (3) no third-party testimony of the deceased's willingness or ability to pay, (4) no reliance on a prior employment relationship.

The majority opinion, in its analysis of the *Suddreth* opinion, regards the nature of the services as the basis from

which the promise for payment is persuasively inferred. Even a cursory reading of the *Suddreth* opinion shows that this is incorrect. The performance of services constitutes the consideration for the contract, *if* a contract is to be inferred from the circumstances in which the services were performed. The performance of services is *not* proof of the implied offer and acceptance. The fact that the services may be beyond the scope of neighborly concern, when viewed against a background of a prior employment relationship, was held to be persuasive that another employment relationship existed in a subsequent instance under the facts of the *Suddreth* case. In the case at bar, the necessary ingredient, to wit, circumstances from which the existence of a contract would normally be inferred before the services were rendered, is entirely missing.

Compare *Johnson v. Suddreth's Estate, supra,* and an earlier case cited in that opinion, *Johnson v. Nasi,* 50 Wn.2d 87, 309 P.2d 380 (1957). In the *Nasi* case, this court affirmed a dismissal similar to the one before the court now. It is the history of previous gratuities indulged in by both the decedent and the plaintiff in that case, which belies the existence of an implied contract. *It is that same kind of history which belies a contract implied in fact in the case at bar.* I am unable to understand why the majority did not compare the facts of the *Nasi* case to the facts before the court now. The circumstances are very similar. The *Nasi* case shows the other side of the coin from the *Suddreth* case, *i.e.* the presence of "reciprocal benefits," which are shown by the history of gratuities bestowed on each party by the other over a period of time.

I think that the majority has been misled by looking first to see what services were rendered instead of first ascertaining whether the existence of a contract has been proven. There are prior cases in this jurisdiction which recognize this problem and prescribe the proper order of proof in such cases.

Analogous to the problem presented by this case is our decision in *Sweetser v. Palmer,* 147 Wash. 686, 267 Pac. 432

(1928). There, Mrs. Hamilton, the decedent, owned a small farm (40 acres) on which she operated a dairy. Sweetser took up his residence on the farm in 1899 and resided there continuously until Mrs. Hamilton's death, 26 years later. He filed an alternative claim against her estate: (1) a contract made between them in 1899, whereby he was to perform services during her lifetime and she was to leave him her entire estate upon her death, or (2) he was to receive the reasonable value of services performed by him for the decedent during this period (alleged to be approximately $14,800). Upon rejection of the claim, he sued the administrator. The *Sweetser* case (like the case at bar) involved two causes of action: (1) an alleged contract to devise, and (2) an implied contract to pay the reasonable value of services rendered (alleged to be $14,800). The trial court dismissed the suit because of lack of sufficient evidence to prove either contract. The first cause of action (the express contract to devise) was abandoned on appeal. The dismissal of the second cause of action (reasonable value of services) was affirmed by this court, holding that the evidence as to the existence of such contract was insufficient. Note carefully that there was evidence of some kind of contract in the *Sweetser* case. This court affirmed the trial court's finding that there was no contract to pay the reasonable value of services rendered *because of the obvious fact* that (1) the decedent was not financially able to pay the alleged value thereof during her lifetime, and (2) that payment of the claim after her death would clearly exhaust the estate of the decedent. That is also the situation in this case. The court, in the *Sweetser* case, recognized that there was some evidence of some kind of contract, and that the plaintiff-appellant may have done the work, relying on some kind of agreement between the parties, but it was unwilling to allow the claim based on the alleged wage contract for the reason that, if there were a contract, it could not have been one to pay for the services rendered. That is precisely the situation in the case before us now. Indeed, the danger of relying on the amount of the services

(which may well have been constituted sufficient consideration) to prove the alleged contract is particularly acute in the proof of contracts implied in fact in a family friendship situation, such as we have in the case at bar.

Third, my basic disagreement with the majority is that I am unable to find in this record any evidence of circumstances from which to infer a promise of the decedent to pay appellant wife a monetary consideration for her services. At the risk of undue prolixity, I deem it necessary to refer to the record, and particularly to the pertinent testimony of appellant.

Appellant sued decedent's executor on two theories, (1) decedent's express promise to will the lake property to her, and (2) decedent's promise, implied in fact, to pay her the reasonable value of her services. At the end of all the evidence, appellants agreed in open court that they had not proved the express promise to will the lake property. The only remaining cause of action was based upon the promise, implied in fact, to pay appellant wife the reasonable value of her services. As I understand her theory, appellants relied on the surrounding circumstances of the parties to prove that the deceased had promised to pay appellant wife the reasonable value of her services. Keeping in mind what kind of evidence appellant has chosen to rely on in her second cause of action, we must consider the testimony in the record to see if there is any evidence to support her claim.

Appellant wife testified that, since she was a little girl in school, she had known the decedent—a period of over 30 years. Her parents had been friends of decedent and his wife (who had pre-deceased him). In November, 1958, appellant went to see the decedent at his home at the time when he was recovering from pneumonia. He was then about 84 years of age. This was the beginning of a 3-year period during which she performed the services described in her testimony. Appellant first claimed that she had not seen Dr. Brock for several years. She later testified that she had cared for Dr. Brock intermittently prior to Novem-

ber, 1958. Ignoring the inconsistency of her testimony, I am impressed by the inconsistency of her actions. She made no claim for these prior services when they were rendered nor did she do so in her present suit.

Just prior to the commencement of the services in the fall of 1958, the decedent had had pneumonia following his return from a trip to Japan. He had previously sold a piece of property at Lake Crescent in order to finance the trip. Regarding decedent's financial situation when appellant started to help him, she testified:

A. When Dr. Brock came back from Japan he realized with his $33 a month he didn't have much, and he wanted to paint the house and get new curtains for the living room. He had mentioned to another woman about selling the place at the lake before he went to Japan in order to get the money to go.

Previously, appellant had stated:

Q. You made at one time a list of the things you had bought for the doctor? A. Yes. Dr. Brock had very little for a man practicing dentistry in his home for that many years. He didn't have a toaster or electric blankets, or curtains.

There was no testimony by appellant or any other witness to the effect that there was ever any agreement between the decedent and herself that he was to pay her the reasonable value of her services. Her own testimony as to why she had never given the decedent any bill for services rendered during this 3-year period was, "Our understanding was the place at the lake was to be mine."

Thus, by appellant's own testimony, it conclusively appears that there never was any contract (express or implied) between the parties that she would act as his nurse for the rest of his life in return for which he would pay her the reasonable going wage for her services. Her own version of the alleged agreement was that she expected to be compensated by the devise of the lake property. Appellant stated that she relied on this alleged *express* promise. This was the basis for her first cause of action, which was dismissed on the motion of her own counsel when appellant

rested her case with the statement that she could not prove this express agreement.

Her second cause of action was properly dismissed by the trial court at that time because there was not a scintilla of evidence to support the contract implied in fact alleged therein or that appellant relied on such a contract.

The majority opinion holds that there was prima facie evidence of a contract implied in fact. The only facts relied upon by the majority appear to be the amount and nature of the services performed by appellant (beyond neighborly concern and helpfulness) and the *assumption* that the decedent did intend, or should have intended, to pay the reasonable value thereof.

The evidence shows that appellant befriended an old friend of her deceased parents who was 84 years old and seriously ill. He had very little money, as she well knew. He owned the lake property and the house in town which he occupied, but had virtually no cash. Appellant performed these service over a period of more than 3 years, during which the decedent was becoming physically weaker and more dependent upon her for physical care. The only evidence of "requests" for her services occurred *after* she had already started giving him care, which she began to do on a voluntary basis. These "requests" consisted of telephone calls in which he apparently asked her to come over. Such "requests" could hardly be evidence of a *change* in the character of their relationship from that of friends (one of whom was performing gratuitous services) to that of employer-employee. There is no evidence of the content of the "requests" nor any showing that Mrs. Jacobs did anything different after the "requests" than she had done before the "requests".

She stated that all this time she had never mentioned to him any expectation of receiving wages for her services because she had expected, as her compensation, to receive the lake property at his death because of his alleged express promise to devise it to her. However, appellant candidly admits her inability to prove the express promise. I am unable to see where she relied on an implied promise.

Evidently the decedent at one time had intended to leave appellant the lake property by will because he had declined to sell it to two prospective purchasers for the stated reason that it was to be hers. From this evidence, an intent to make a gift might be inferred. Appellant wife abandoned her attempt to prove a contractual right to this devise.[2] The admitted inability of appellant wife to prove the express promise is certainly not evidence of the existence of the contract implied in fact in this case.

The holding of this court in *Sweetser v. Palmer, supra*, based on similar facts, is applicable to the present case. We there said, at page 687:

> The trial court held that he was not entitled to recover on either theory, and entered a judgment to the effect that he take nothing by his action. On his appeal, the appellant relies wholly on the second branch of the claim, contending that there was an implied agreement between himself and Mrs. Hamilton that he was to be paid the reasonable value of his services, and that such reasonable value is the sum demanded in his claim.
>
> . . . .
>
> Claims of the nature of the one here in question are not looked upon by the courts with favor, and are never sustained, except upon clear and convincing testimony. What we have heretofore said upon the subject we need not here repeat. Those interested will find the question extensively discussed in the following cases: *Wall v. McEnnery's Estate*, 105 Wash. 445, 178 Pac. 631; *Frederick v. Michaelson*, 138 Wash. 55, 244 Pac. 119; *Henry v. Henry*, 138 Wash. 284, 244 Pac. 686.

In the case at bar, the total value of Dr. Brock's estate is not precisely stated. However, from the testimony of appellant wife (quoted above) it appears that at the time her services were rendered (1958 to 1961) he owned the lake property (estimated to be worth about $10,000) and an old house in Port Angeles in which he lived and formerly had his dental office. It needed painting and redecorating, but with his $33 per month income he could not afford to have this work done.

---

[2] See *Bicknell v. Guenther*, 65 Wn.2d 749, 399 P.2d 598 (1965).

With this knowledge of the decedent's assets and financial situation, appellants performed services (which they now claim were worth $11,500) without ever informing the decedent that they expected to deplete his estate by this substantial sum if he failed to compensate them during his lifetime. The claim for these services, based on an alleged implied contract, was clearly an afterthought because, as appellant wife testified, the only compensation she expected was the devise of the lake property. When this failed to materialize, appellants asserted this claim for services which, if allowed, would bring them more cash than the lake property, and would substantially exhaust the decedent's entire estate.

To paraphrase a sentence in the *Sweetser* case, whatever may have been appellants' idea of the transaction, it is beyond belief that Dr. Brock ever supposed that he was subjecting himself to this enormous bill for services, the practical effect of which would be to revoke his will made in 1956.

Any other result than an affirmance in the present case will permit friends or relatives who are disappointed in not receiving what they expected to receive under the will of a decedent, to file a claim against the estate for the "reasonable value of services rendered." The greater the kindness of the friend and the greater the amount of the services rendered, the less proof the majority requires to establish such a contract. This frustrates and abrogates the statutory right of testamentary disposition.

When Dr. Brock made his will on April 12, 1956, which was nearly 6 years before his death, he left the lake property to his great, great niece. He never changed his will after appellant began performing services for him late in 1958. He had no reason to suspect that his friends (appellants) would attempt to frustrate his intention as expressed in his will regarding the disposition of his estate.

The fact that appellants were disappointed in not receiving the lake property at decedent's death does not, in my opinion, justify the majority's holding that the decedent's

estate is liable for $11,500 for appellants' services which were rendered in the expectation of a devise that failed to materialize.

The right of testamentary disposition of one's property is a valuable right granted by statute (RCW 11.12.010), and a testator may will his property to any person he wishes regardless of whether such person has done little or a great deal for him in his lifetime. See *In re Meagher's Estate*, 60 Wn.2d 691, 375 P.2d 148 (1962).

The courts have no power to dispose of a decedent's property after his death in any manner other than as he provided in his will, except where he had previously entered into a valid contract prior to his death to do otherwise. This, the trial court found that the decedent never intended to do.

Appellants have failed to establish, by substantial evidence, a prima facie case on the basis of their alleged implied contract. I am, therefore, of the opinion that the trial court's judgment of dismissal was properly entered, and I would affirm it.

ROSELLINI, C. J., HILL and OTT, JJ., concur with DONWORTH, J.